STATE OF NORTH CAROLINA v. JAMES E. JEFFRIES

No. 8125SC165

(Filed 5 January 1982)

1. **Criminal Law §§ 75, 75.7— statements to officers by defendant—no custodial interrogation—voluntary—properly admissible**

    The trial court did not err in admitting into evidence three separate statements made by defendant, who was indicted for feloniously and willfully setting fire to his store and for five counts of first degree murder in connection with deaths resulting from the fire. Defendant made the first statement after going to the Law Enforcement Center voluntarily, voluntarily submitting to a polygraph test and after being told by the person administering the test that he did not believe defendant was telling the truth. Before he submitted to the test, defendant was read his rights and signed a waiver acknowledging that he was free to end the test and to leave at any time. After the first statement defendant was again advised of his rights but he was not under arrest and was told he could leave anytime. He made two more statements to two other officers. He was not arrested until three weeks later. Under these circumstances, defendant's statements were made voluntarily and while he was not in custody.

2. **Constitutional Law § 30— sanctions for failure to comply with discovery—discretionary with judge**

    Where a defendant follows the procedures for seeking discovery outlined in G.S. 15A-902(a) and 15A-903(d) and (e), and the State fails to comply with the court's order compelling discovery, there are several sanctions available to the court under G.S. 15A-910, including prohibiting the noncomplying party from introducing evidence not disclosed. However, where the record on appeal did not contain defendant's initial G.S. 15A-902 letter nor his motion to compel discovery; where defendant only entered a general objection when a can of vinyl flooring was entered into evidence; and where there was no allegation the prosecutors acted in bad faith, the Court found no abuse of the trial court's discretion in allowing the flooring into evidence.

3. **Constitutional Law § 30— failure to comply with discovery—admitting testimony discretionary**

    Where the trial judge found that defendant was not prejudiced by the State's failure to furnish copies of tests which indicated that the fire defendant was accused of starting did not originate in the building's electrical system or furnace, and where the court offered defendant a reasonable time period in which to review the reports, the trial court did not abuse its discretion in admitting testimony concerning the tests.

4. **Criminal Law § 158— failure to include photographs in record—no review**

    Failure to include excepted-to photographs and film footage in the record is a violation of App. R. 9(b)(3) and makes it impossible for the Court to rule on the admissibility of the evidence.

**5. Criminal Law § 43.4— testimony concerning appearance of persons killed in fire proper**

Testimony about the appearance of firemen who died fighting the fire defendant was accused of starting was in no way incompetent or irrelevant to the issues being tried.

**6. Criminal Law § 50— jury unable to draw on inferences—opinion testimony admissible**

In a prosecution concerning the felonious setting of a fire to defendant's store, it was not error to allow one fireman to testify the steam he observed was "an indication that they had hit the seat of the fire" and for another fireman to testify the smoke smelled like "burning oil or some type of petroleum product" as the facts upon which each opinion was based could not be described in a manner which would allow the jury to draw their own inferences.

**7. Criminal Law § 66.18— waiver of objection to identification testimony—no error in court's failure to exclude ex mero motu**

There was no error in the court's failure to exclude identification testimony of a witness *ex mero motu* at the end of a *voir dire* where the defense counsel chose to withdraw his objection to the testimony at the end of the *voir dire*. A defendant may, for whatever reason, waive the benefit of constitutional provisions by express consent.

**8. Criminal Law § 43.5— videotape of unavailable witness's testimony—admission proper—cross-examination not thwarted**

The trial court did not err in admitting a videotape of a witness's testimony under the following facts: Defendant's trial was in its sixth week when the last witness for the State was hospitalized; the witness's physician would not allow the witness to return to the courtroom for at least two weeks, but would allow him to testify *via* videotape from the hospital; the trial judge presided over the videotaping session at which defendant, his counsel, and his expert advisor were present, and the defense counsel's cross-examination appeared thorough and unrestrained as it comprised 49 pages of the record on appeal. Admission of a witness's videotaped testimony in a criminal case does not constitute an inherent violation of a defendant's right to confront witnesses against him; however, the conditions under which such testimony is allowed must be controlled in the following manner: (1) There must be exceptional circumstances necessitating the procedure. (2) The witness must be unavailable to testify within a period of time after which the trial itself would be subject to mistrial. (3) The videotaped session must be under the control of the trial judge, and the defendant and his attorney must be allowed to attend. (4) Effective cross-examination by defendant must be unimpeded. (5) All measures must be taken to eliminate possible prejudice due to the location or condition of the witness. (6) The videotape shown to the jury must be clear.

**9. Homicide § 30.3— submission of lesser included offense—no evidence supporting charge—harmless error**

Submission to the jury of the offense of involuntary manslaughter was error where the evidence supported the State's theory that five deaths resulted

from defendant's feloniously and deliberately setting fire to his store. However, the error was not prejudicial. The jury's verdict finding him guilty of involuntary manslaughter implicitly but clearly rejected his defense that he did not commit the act upon which the charges were based. When the jury discarded defendant's sole defense, all the evidence pointed to the greater crime of felony murder.

10. **Constitutional Law § 34; Criminal Law § 26.5— convictions of involuntary manslaughter and unlawful burning—no double jeopardy**

   Defendant's conviction of involuntary manslaughter and unlawful burning arising out of the same transaction did not constitute double jeopardy.

APPEAL by defendant from *Ferrell, Judge.* Judgment entered 22 April 1980 in Superior Court, CATAWBA County. Heard in the Court of Appeals 14 September 1981.

On 9 July 1979, defendant was indicted on the charges of: (1) conspiracy to violate G.S. 14-62 by willfully, feloniously and wantonly setting fire to the Gardner Building in Shelby, North Carolina, for the purpose of collecting monies under the terms of an insurance policy, (2) the felonious and willful setting of fire to the Gardner Building, and (3) five counts of first degree murder for the deaths of four firemen and one city employee who died in the fire. Prior to his trial, defendant made numerous motions including a motion for a change of venue from Cleveland County. Change of venue was allowed, and defendant's case was tried in Catawba County. Defendant's motion for a court-appointed expert in arson investigation was also allowed.

At trial, State's evidence tended to show that on 25 May 1979 at approximately 6 p.m., Melinda Setzer was working in the rear of J.E.'s, a clothing store located in the Gardner Building, when she smelled what she thought was kerosene. After checking with Assistant Manager Mary Ann Skinner at the front of the store, Setzer returned to her work. She again smelled something like charcoal lighter fluid. She looked out a window in the rear of the building and saw smoke coming from the west. Behind the building, Setzer found smoke "coming from behind Jeffries [sic] Clothing", another store located in the Gardner Building. She immediately returned to J.E.'s, where the assistant manager was calling or had already called the fire department. Then smoke started coming through the ceiling of J.E.'s, and the two employees evacuated the store. Setzer ran to Jeffries', the Bible Book Store and Wonderland Toy, the other three stores located

within the Gardner Building, to warn of the fire, but she found no one in any of those stores.

At approximately 6:15 p.m., the Cleveland County communication center received Skinner's call, and within minutes the Shelby Fire Department responded. In addition, members of the Cleveland County Volunteer Fire Department went to the Gardner Building. Smoke and fire seemed to be located in the rear of Jeffries', so water was sprayed into that store. The double back door to Jeffries' was knocked in, allowing the firemen to observe "an inferno", with flames rolling "in a circular motion". At 6:43 p.m., without warning, the building exploded. Glass flew across the street, and the entire structure of bricks and concrete collapsed into the street and the alley. Four firemen and a city employee were trapped by the debris and died as a result of the impacts to their bodies.

In addition to testimony by firefighters and other eyewitnesses that the fire appeared to be located in defendant's store, there was evidence that the fire had originated there, flammable fluids or accelerants having been used to start it. Earl Hatcher, the Chief Arson Investigator for the State Bureau of Investigation (S.B.I.), qualified as an expert in the field of arson investigation. He testified that he had observed deeply charred or alligatored 2 x 4 inch studdings on the east and west walls of Jeffries', and deep charring in the southeast corner of the store, both of which indicated the presence and ignition of accelerants. Tile taken from the floor of Jeffries' bore the odor of a petroleum product similar to that of mineral spirits. After examining Jeffries', J.E.'s, and the Bible Book Store, Hatcher concluded that the fire in the Gardner Building originated from the ignition of liquid accelerants in the southeast corner of Jeffries' store.

William E. Kelleher, an expert in the field of fire origin and arson investigation, gave his opinion that the fire originated in Jeffries'; that flammable fluids had been employed; and that their vapors had reached the explosive range sometime after the fire was set, thus causing the explosion. This opinion was based on Kelleher's personal investigation of the scene and his interviews of firemen who were present when the building burned. Kelleher testified that the burn holes in Jeffries' revealed that the fire had burned downward, following an unnatural path, due to the

presence of a liquid accelerant which flowed to the lowest point possible. The alligator burn pattern also supported Kelleher's conclusion that an accelerant had been poured on the floor.

There was evidence that defendant's business was not doing well. One customer testified that the defendant's store did not appear to be completely stocked. A United Parcel Service employee testified that merchandise delivered to the store had been consistently shipped COD (cash on delivery) or had been prepaid. Furthermore, when defendant relocated to the Gardner Building eight months before the fire, he had increased his inventory insurance coverage from $15,000 to $20,000.

James F. Walker, who had worked with defendant previously, testified that approximately one month before the fire, defendant had offered him a thousand dollars to set fire to his store. Walker refused. His testimony was corroborated by several witnesses to whom he had told the story both before and after the 25 May 1979 fire.

The State's evidence also tended to show that the day before the fire, the defendant and an unidentified man were seen reading labels on cans of paint thinner, naptha, lacquer thinner, and solvents at the Cal-Tone Paint Store. No purchases were made. Just after 5:00 p.m. on 25 May 1979, two customers entered Jeffries', spoke with defendant, and noticed one Sammy Guest in the rear of the store. Guest and defendant left with the customers at approximately 5:20 p.m.; defendant locked the front door and drove off with Guest. No one else was seen in the store.

Over defendant's objection, the State introduced evidence that on 31 May 1979, defendant told S.B.I. agent Albert Stout that he didn't care if his business burned but he hadn't wanted anyone to get hurt; that Sammy Guest told him he could burn the place by leaving a cigarette in the ashtray, and that, on 24 May 1979, a cigarette was left burning on the carpeted floor next to the ashtray, but it burned out; and that thereafter Sammy Guest told defendant he would take care of it.

Also over defendant's objections, the State introduced two more statements of the defendant, one made to Frank Lee, a Special Agent of the Bureau of Alcohol, Tobacco and Firearms, and made another to S.B.I. Special Agent Jack Richardson. Agent

Lee testified that defendant had told him that he had been hoping his business would burn so he could collect the insurance money; that he was being pressured by companies who wanted to be paid by defendant; that he, Jeffries, had jokingly stated to several persons that he wouldn't care if his business burned; that he could not understand how the building exploded; and that he was sorry the five men had died. The statement defendant made to Richardson was similar but added that Sammy Guest had told defendant that he could burn the business for him because he had burned a house one time and was never caught; that a burning cigarette Guest placed on the carpet failed to ignite a fire; and that Guest told defendant that he would make sure it burned next time and defendant wouldn't know anything about it.

Defendant offered no evidence.

The jury returned verdicts of guilty to five counts of involuntary manslaughter, one count of felonious burning, and one count of felonious conspiracy to burn. From the imposition of consecutive prison terms, defendant appeals.

*Attorney General Rufus L. Edmisten, by Special Deputy Attorney General Lester V. Chalmers, for the State.*

*Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A., by James E. Ferguson, II, for defendant-appellant.*

HILL, Judge.

Defendant brings forward seven assignments of error. The trial of the case as well as the issues on appeal are complex. We have considered all of defendant's assignments, and find no error in the trial.

I.

[1] Defendant first contends that his right against self-incrimination was violated when the trial court admitted into evidence incriminatory statements which defendant made to law enforcement officers. Defendant contends that these statements were made without the requisite constitutional warnings and that they were induced by misleading police statements and false police promises that the statements would be kept in confidence.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), the Supreme Court held that the prosecution may not use either exculpatory or inculpatory statements which result from custodial interrogation of a defendant unless the prosecution can show the use of procedural safeguards which effectively secure the privilege against self-incrimination. "[B]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* However, "[p]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 50 L.Ed. 2d 714, 97 S.Ct. 711 (1977). In *Mathiason*, custody was characterized as a restriction on one's freedom or detention in a "coercive environment".

Our Supreme Court has analyzed custody by applying an objective test which involves determining whether a reasonable person would believe under the circumstances that he is free to leave the place in which he is being questioned. *State v. Perry*, 298 N.C. 502, 259 S.E. 2d 496 (1979). Citing *Mathiason*, supra, the Court focused on three time frames to determine whether a reasonable person would believe that he was free to leave the place of interrogation.

> [1] events occurring *prior* to the questioning, including the fact that the defendant had voluntarily appeared in response to a written request; [2] events happening *during* the questioning, including the fact that defendant was told at the outset he was not under arrest but that he was a suspect; and [3] events taking place *after* the questioning, including the fact that defendant was allowed to leave the parole office unhindered even though he had confessed to the burglary.

*State v. Perry*, supra.

In light of the foregoing principles, we conclude that Jeffries was not in custody when he made his inculpatory statements. When the State sought to introduce statements which the defendant had made to S.B.I. Agent Stout, the defendant objected, and an extensive *voir dire* was conducted. Upon defendant's motion,

the trial judge ordered each State witness for the *voir dire* sequestered. Evidence adduced on *voir dire* tended to show that defendant came voluntarily and unaccompanied to the Law Enforcement Center in Shelby. He submitted to a polygraph test, and even though not in custody, was read his rights by Agent Stout. Defendant signed a waiver acknowledging that he was free to end the test and to leave at any time. His meeting with Stout lasted from shortly after 9 o'clock a.m. until approximately 11:45 a.m. Stout testified that defendant's appearance was good and that he did not seem to be under the influence of drugs. Defendant was offered and given coffee twice. After completing the polygraph test, Stout informed defendant that, in his opinion, defendant was not telling the truth. At this point, the defendant made his statement to Stout. After defendant made the statement to Stout, Agent Lee again advised defendant of his constitutional rights.

According to Agent Lee's testimony on *voir dire*, the defendant was not under arrest during his questioning on 31 May 1979. When Lee told defendant that he and Agent Bradley wanted to talk to him but that the defendant could leave anytime, defendant indicated he wanted to talk to them. When Lee told defendant that he had to advise him of his rights, defendant said it was not necessary. After Lee indicated to defendant that he might be arrested for the fire, defendant gave his statement. When Agent Lee was ready to leave, defendant made a request to talk to Agent Bradley with whom Lee left him. At 2:30 p.m., Lee checked to see if the defendant needed anything and to tell the defendant he could leave if he wanted to. The defendant did not leave, nor did he request anything. At 4:00 p.m., Lee returned to the room and asked the defendant if he were ready to leave, and at this time the three men left and walked to defendant's car in the parking lot. The defendant was not arrested until some three weeks later.

No threats, no promises of rewards or hope for rewards were made to defendant. Neither was there any promise or commitment that defendant's statement would be held in confidence. Defendant was not deprived of sustenance. The evidence on *voir dire* shows no "coercive environment". Defendant, free to leave at any time, was not in custody when he made his inculpatory statements.

The officers questioning defendant advised him several times of his constitutional rights, as would have been necessary in a custodial environment. Prior to administering the polygraph test, Agent Stout informed defendant of his rights, and defendant, a college graduate, signed a waiver which read, in pertinent part:

I, James E. Jeffries, being 32 years of age and of sound mind voluntarily without threats, duress, coercion, force, promises of immunity or reward and understandingly agree and stipulate to take a polygraph examination for the mutual benefit of myself, the State Bureau of Investigation and Shelby Police Department, I fully realize that I am not required to take this examination, I may first consult with an attorney or anyone I wish before either signing this form or taking the examination, I have the right to remain silent the entire time that I am here, anything I may say can be used against me in any court of law.

I have the right to talk to a lawyer for advice before answering any questions and to have him present during questioning. If I cannot afford an attorney and desire one, an attorney will be appointed for me before any questioning if I wish. If I decide to answer questions now without a lawyer present, I will still have the right to stop answering at any time. I also have the right to stop answering at any time until I have talked to a lawyer, and I have the opportunity to exercise all these rights at any time I wish during the entire time I am here. Nevertheless, I voluntarily request and authorize A. S. Stout to proceed with the examination.

I do hereby authorize the State Bureau of Investigation, its officers, and/or employees to disclose both orally and in writing the examination results and opinions to employees and/or representatives of the Shelby Police Department. I have had the above read to me and fully understand the true contents thereof.

Witness by myself and signed by Mr. Jeffries. This examination was concluded at 11:45 a.m. on the above date. I completely reaffirm my above agreement. I knowingly and intelligently continue to waive all rights, including those listed in the second paragraph above and I willingly made all statements that I did. I also certify that during the entire time I was well treated, submitted myself freely to the ex-

amination knowing that I could stop at any time so desired by merely saying I wished to stop or that I wished to consult an attorney. I remained of my own free will knowing that I could leave this room at any time I so desired and that there were no threats, promises, or any harm done to me during the entire period I have been here, either in connection with the examination or the signing of this consent.

After the test, Agent Lee offered to read defendant his rights, but he indicated then to Lee and later to Richardson that he understood those rights.

Defendant also contends that the statements he made to the law enforcement officials were involuntary and should have been suppressed. We must also disagree with this contention.

In ruling on the admissibility of an inculpatory statement, the trial judge should focus on "the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . .". *Rogers v. Richmond*, 365 U.S. 534, 5 L.Ed. 2d 760, 81 S.Ct. 735 (1961). When defendant claims that he made a statement involuntarily, it is the duty of an appellate court to examine the record and to make a determination on the ultimate issue of voluntariness. *Beckwith v. United States*, 425 U.S. 341, 48 L.Ed. 2d 1, 96 S.Ct. 1612 (1975). We recognize that a person's will may be overcome by hope or fear, or by physical or psychological coercion. In the instant case, however, we find no evidence that defendant's will to resist was overcome by coercion or other devious means.

Defendant came voluntarily to the Law Enforcement Center. He submitted voluntarily to a polygraph test, and, when he was told that the person administering the test did not believe he was telling the truth, defendant made the first of three similar statements. The evidence was uncontradicted that defendant was reminded generally of his rights, that he actively declined to have them read to him again, and that he declined to exercise those rights. Defendant was neither threatened nor offered any reward or hope of reward. While the defendant makes much of the length of time he remained at the Center, there was evidence that he was told on several occasions that he could go. He was offered

food and drink, and he appeared normal. He was free to leave and did so, finally, at 4:00 p.m.

Defendant also argues that Lee's partner Bradley coerced him into making statements in confidence and that, thereafter, the defendant was coerced into repeating the statement to Agent Stout. In response to this, we note first that the trial court refused to allow the State to introduce the statement made to Bradley. Secondly, defendant's theory that such "confidence" carried into his statement to Stout is unsupported by the evidence. These assignments are overruled.

## II.

We next consider defendant's two broad assignments of error relating to the admission of evidence. He first assigns as error the admission of "exhibits and related testimony arising out of discovery materials which the prosecution failed to timely and meaningfully furnish to the defense in compliance with the court's pretrial discovery orders and by sanctioning [the] prosecutorial concealment of exculpatory material". Defendant notes 108 exceptions he took to the introduction of such evidence which included cans of vinyl flooring, tests conducted by witnesses Maddry and Grotts, reports by witness Kelleher, numerous photographs, and a tape recording of the fire dispatcher's conversation with witness Skinner.

[2] Under Article 48 of Chapter 15A of our General Statutes, a party seeking discovery must first request in writing that the other party comply voluntarily with the discovery request before filing any motion with a judge. G.S. 15A-902(a). If the other party fails, within seven days, to respond or to respond adequately, then the first party may file a motion for discovery concerning any matter the second party failed to furnish or furnished inadequately. *Id.* Under G.S. 15A-903(d) and (e), on defendant's motion, the trial court is directed to order the prosecutor to allow the defendant to inspect and copy or photograph documents, tangible objects, and reports of examinations and tests.

This record contains neither defendant's initial G.S. 15A-902 letter, nor defendant's motion. The record does, however, contain the trial court's order that the State allow the defendant to inspect, copy, and photograph certain documents and pieces of

evidence. Sanctions for failure of the State to comply with the order are governed by G.S. 15A-910, which allows the court, in addition to exercising its contempt powers, to:

(1) Order the party to permit the discovery or inspection, or

(2) Grant a continuance or recess, or

(3) Prohibit the party from introducing evidence not disclosed, or

(4) Enter other appropriate orders.

The trial court's action in such matters is discretionary. *Id. See State v. Stevens*, 295 N.C. 21, 243 S.E. 2d 771 (1978).

Defendant argues that the trial judge should have exercised his discretion under G.S. 15A-910(3) to exclude the cans of vinyl flooring. When the State sought to introduce the evidence, defendant entered a general objection which was overruled. Defendant failed to state the basis of his objection, and he failed to request any of the other remedies available to him under G.S. 15A-910. In this regard, we feel compelled to emphasize again the complexity of this trial, in which well over 100 exhibits were introduced. There has been no allegation that the prosecuting attorneys acted in bad faith. Based on these facts, we find no abuse of the trial court's discretion in allowing the State to introduce the cans of vinyl flooring into evidence.

[3] As to defendant's arguments concerning tests conducted by witnesses Maddry[1] and Grotts,[2] the record shows that the trial court conducted an *in camera* examination concerning these tests as well as some tests conducted by witness Kelleher. The trial judge found that defendant was not prejudiced by the State's failure to furnish copies of tests which indicated that the fire did not originate in the building's electrical system or furnace. The court offered the defendant a reasonable time period in which to review the reports. We find no abuse of discretion by the trial court.

---

1. Witness Maddry qualified as an expert in electrical systems and testified that, in his opinion, the fire did not originate within the electrical system.

2. Witness Grotts, an employee of the North Carolina Utilities Commission, was *not* allowed to give his opinion as to the role of natural gas leaks in starting the fire.

It is difficult to determine from the record which of the numerous photographs offered by the State had been seen by the defendant's counsel prior to trial. None of the photographs have been tendered to this Court for our review. In light of this and in view of the fact that the court permitted defense counsel time to review the photographs, we find that the trial court did not abuse its discretion in allowing the photographs into evidence.

The final item about which defendant specifically complains is the tape recording of witness Skinner's phone call reporting the fire. The record shows, however, that defense counsel stated that he had no objection to the playing of the portions of the tape actually played. We find no error.

[4, 5] We turn now to the trial court's admission of testimony which defendant contends was "irrelevant, immaterial, incompetent, remote, prejudicial and inflammatory". Defendant contends the admission of such testimony violated his constitutional rights to a fair trial, to due process of law, and to equal protection of the laws. First, defendant contends that the trial court erred by permitting certain State's witnesses to testify in detail about the appearance of the five men who died fighting the fire, to give misleading and confusing testimony about the location of the bodies, and to introduce inflammatory photographs and film footage.

The excepted-to photographs and film footage are not included in the record. This is a violation of App. R. 9(b)(3) and makes it impossible for us to rule on the admissibility of the evidence. As to allowing the testimony of the eye witnesses, we can find no error. Witnesses Hollifield, Lynch and Humphries all observed the events occurring at the Gardner Building on 25 May 1979. Witness Smith investigated the area two days later. While the witness' descriptions of the fire and its victims are not pleasant, the testimony was in no way incompetent or irrelevant to the issues being tried. Neither do we find repetition which was prejudicial or inflammatory.

[6] Secondly, defendant contends that the court erred in allowing two firemen to speculate about the meaning of physical phenomena at the fire scene. Captain Rogers was allowed to testify that steam he observed was "an indication that they had hit the seat of the fire with the water in the back". It is unclear

from the testimony where the steam was coming from, and, when the prosecutor attempted to have Captain Rogers place the "seat of the fire" at Jeffries', the court sustained defendant's objection. We therefore find no prejudicial error. Fireman Price was allowed to testify that the smoke coming from Jeffries' smelled like "burning oil or some type of petroleum product or chemical". This testimony was admissible under the general rule that opinion evidence is permissible when the facts on which the opinion is based cannot be described in a manner which would allow the jury to draw their own inferences. *See, generally,* 1 Stansbury's *North Carolina Evidence* (Brandis Rev. 1973), § 125. These assignments are overruled.

### III.

[7] Defendant also assigns error to the admission of witness Paul's testimony, identifying defendant as one of two men who had shopped for paint thinners in a local paint store several days before the fire. Defendant argues that the trial court should have excluded the testimony *ex mero motu* because the identification stemmed from a photographic display so egregiously and impermissibly suggestive as to violate defendant's constitutional rights. Upon defendant's objection to the identification testimony, the court conducted a *voir dire* examination of Paul and the Shelby Police Officer to whom Paul identified defendant. At the end of the *voir dire*, the following dialogue took place between counsel for defendant and the trial judge:

MR. RANDALL: I have conferred with my client and the investigator in this case and I request, your Honor, to be permitted to withdraw the motion to suppress and to proceed with the examination of the witness Paul.

COURT: Well, now, the court will observe for the record that counsel did in fact confer with the defendant and the investigator in this case and would permit the counsel to withdraw the motion to suppress the in-court identification of the defendant by the witness Paul, and in so doing the court will observe that the identification is of independent origin based solely upon the observations of the witness at the place of business in question, the Cal-Tone Paint Store, and is not based upon any photographic procedure or exhibits illegally or otherwise and that there is nothing of sufficient

value to indicate the witness' identification is mistaken. Call the jury back. The motion is allowed to withdraw the original motion to suppress.

While we do not know why the defense attorney chose to withdraw his objection to Paul's testimony, we do not believe the trial court is required to second-guess defense counsel, rejecting, *ex mero motu*, what may have been valid strategy on counsel's part. A defendant may, for whatever reason, waive the benefit of constitutional provisions by express consent. *State v. Gaiten*, 277 N.C. 236, 176 S.E. 2d 778 (1970), *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980). This assignment is overruled.

IV.

In defendant's fourth assignment of error, he contends that the court erred in refusing to allow him to cross-examine effectively several of the State's witnesses. Under this assignment, defendant lists nearly 100 exceptions he took to the exclusion of testimony. He failed, however, to present an argument as to all of the exceptions, and those which are not argued are considered abandoned. App. R. 28(b)(3). Of the exceptions defendant does argue, he has failed to show in the record what the excluded testimony would have been. *See generally*, 1 Stansbury's, supra, § 26. It is therefore impossible for this Court to determine what evidence was excluded and whether such exclusion was prejudicial to defendant. *See State v. Brooks*, 49 N.C. App. 14, 270 S.E. 2d 592 (1980) *disc. rev. denied* and *ap. dismissed*, 301 N.C. 723, 276 S.E. 2d 285 (1981). We overrule this assignment.

[8] Defendant also assigns error to the manner in which he was required to cross-examine William Kelleher, an expert in the field of fire origin and arson investigation. Kelleher was the final witness called by the State. On 11 April 1980, after Kelleher had almost completed his direct testimony and after court had recessed for the day, Kelleher was admitted to the hospital with a possible case of angina, a coronary condition. As a result of this development, on 12 April, the court excused the jury indefinitely until Kelleher was found to be able to undergo the remainder of direct examination and cross-examination. On 14 April, the trial judge noted that he had been informed by the witness' treating physician that Kelleher had not suffered a myocardial infarction, but that he was suffering from angina, was in a stable condition,

and could not return to court for at least two weeks. Upon inquiry by the court, the treating physician stated that Kelleher would be able to testify before videotape at the hospital if the physician could observe him.

Over defense counsel's objection, the trial court decided to videotape the remainder of Kelleher's testimony in the hospital. Defendant contends that this ruling violated his Sixth and Fourteenth Amendment rights to cross-examine and confront witnesses against him. *See Pointer v. Texas*, 380 U.S. 400, 13 L.Ed. 2d 923, 85 S.Ct. 1065 (1965).

North Carolina courts have fully acknowledged the absolute right of the accused to cross-examine adverse witnesses. *See e.g., State v. Bumper*, 275 N.C. 670, 170 S.E. 2d 457 (1969). However, defendant's assignment of error raises a novel question for this Court. Thus, we look to other jurisdictions for assistance in determining this issue.

In *United States v. King*, 552 F. 2d 833 (9th Cir., 1976), *cert. denied* 430 U.S. 966, 52 L.Ed. 2d 357, 97 S.Ct. 1646 (1977), defendants asserted that the trial court's admission of the depositions of two absent witnesses denied them their rights of confrontation. The government's case depended largely upon the testimony of two unindicted co-conspirators who were serving terms of imprisonment in Japan and who were therefore unavailable to testify at trial. Videotaped depositions were taken pursuant to 18 U.S.C. § 3503 at the Japanese prison, to which defendants and their attorneys traveled at government expense. Upset by restrictions imposed by the Japanese government, however, defendants and their counsel withdrew during the fourth day and returned to the United States. The government continued, completing its examinations. Defendants objected to the use of the videotapes, alleging, *inter alia*, that 18 U.S.C. § 3503 was unconstitutional in its application and on its face because the Supreme Court had never expressly authorized the use of an absent witness's deposition in lieu of trial testimony. In rejecting defendants' argument, the court noted that the Supreme Court had observed that "prior-recorded testimony has been admissible in appropriate cases". *Mancusi v. Stubbs*, 408 U.S. 204, 33 L.Ed. 2d 293, 92 S.Ct. 2308 (1972). The court in *King* wrote:

In *Mancusi*, the Court characterized its concern under the confrontation clause as being

> to insure that there "are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant," *Dutton v. Evans*, (cites omitted), and to "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement," . . . . (cite omitted).

Confrontation meets the need for adequate reliability and evaluation in that it

> (1) insures that the witness will give his statements under oath — thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed. 2d 489 (1970).

*United States v. King, supra.* After analyzing the *Green* decision, which involved the use of a statement made by a key witness at a preliminary hearing, the *King* court held that a deposition taken under 18 U.S.C. § 3503 satisfied procedural safeguards required by the confrontation clause. Under that statute, such depositions are permitted only under "exceptional circumstances". Use of the testimony obtained is allowed only if the witness meets the following "unavailability" criteria: an authorized person must put the deponent on oath; defendants must be afforded the right to be present during the deposition and to be represented by counsel; as full a scope of examination must be allowed as would be allowed at trial; the entire procedure must be under the authority and supervision of the trial court, and the deposition process must expose the witness to rigorous cross-examination on all issues.

The *King* court also found 18 U.S.C. § 3503 constitutional as applied, on the grounds that the deponents were under oath, the presentation of the videotaped testimony adequately allowed the jury to observe the demeanor of the witnesses, and that the conditions under which the depositions were taken were not "oppressive, intimidating, and frightening," so as to constitute a denial of defendant's rights to effective cross-examination.

In *United States v. LaFatch*, 382 F. Supp. 630 (N.D. Ohio, E.D., 1974) *rev'd. on other grounds*, 565 F. 2d 81 (6th Cir. 1977), in a Supplemental Memorandum opinion, the trial court explained why it allowed the jury to view the videotaped testimony of a key defense witness, the wife of the defendant, who apparently had suffered a heart attack during the trial. Aware of the problems associated with a videotaped presentation, the trial court required measures to be taken to minimize the hospital setting. Those steps included showing only the head and shoulders of the witness, not allowing doctors to be present and omitting any reference to the witness' condition.

Although the factual situations differ, we find the analyses of *King* and *LaFatch* persuasive to our resolution of the question. *King* began its analysis with a discussion of cases allowing the admission into evidence of prior-recorded testimony. This Court has likewise held that prior-recorded testimony is admissible under certain circumstances. *State v. Biggerstaff*, 16 N.C. App. 140, 191 S.E. 2d 426 (1972). Holding that the prior-recorded testimony of one of the State's witnesses, who was available for defendant's preliminary hearing but who could not be located for defendant's trial, was admissible, the Court weighed the following factors: the reason for the witness' unavailability at trial, the diligence of the Sheriff's inquiry as to the whereabouts of the witness, the fact that defendant had the same counsel at both hearings, the accuracy of the court reporter's transcription of the witness' testimony at the preliminary hearing, and a good faith effort on the part of the State to secure the presence of the witness at the trial. *State v. Biggerstaff, supra.*

In accordance with these opinions, we hold that the admission of a witness' videotaped testimony in a criminal case does not constitute an inherent violation of defendant's right to confront witnesses against him. The conditions under which

videotaped testimony is allowed, however, must be carefully controlled. First, there must be exceptional circumstances necessitating the procedure. As noted in *King, supra*, the witness must be unavailable to testify within a period of time after which the trial itself would be subject to mistrial. The videotaped session must be under the control and supervision of the trial judge, and the defendant and his attorney must be allowed to attend. Effective cross-examination by defendant must be unimpeded, and all measures must be taken to eliminate possible prejudicial effects due to location or condition of the witness. Furthermore, the videotape shown to the jury must be clear, allowing the jurors to observe clearly the demeanor of the witness.

Applying those criteria to the facts of this case, we find that defendant's trial was in its sixth week when Kelleher, the last witness for the State, was hospitalized. Kelleher's physician would not allow him to return to the courtroom for at least two weeks, but would allow Kelleher to testify *via* videotape from the hospital. The trial judge presided over the videotaping session at which defendant, his counsel, and his expert advisor were present. Since the record does not contain a copy of the videotape, we cannot determine whether the court took sufficient steps to minimize any prejudicial effect arising out of the location or the appearance of the witness. We note, however, that since Kelleher was not a victim of the alleged crime, sympathy for his condition would not necessarily translate into prejudice against the defendant. The crucial issue is whether defendant's attorney was thwarted in his efforts to conduct a vigorous cross-examination of the witness. From the record defense counsel's cross-examination appears thorough and unrestrained. It filled some 49 pages of the record, and, after it was completed, the trial judge noted to defense counsel that "not only have you vigorously cross examined the witness Kelleher, but the State . . . would indicate . . . you have done so as you justifiably ought to do."

In summary, we find that the trial court acted in the interest of justice in allowing the videotaped presentation of witness Kelleher's testimony and that the defendant was allowed full opportunity to conduct a rigorous cross-examination. Defendant's right to confront witnesses against him was not violated and this assignment is overruled.

V.

Defendant's next assignments of error pertain to the trial court's instructions to the jury. We first consider defendant's contention that the court erred in instructing the jury that a fire could be considered a deadly weapon. This charge related only to the question of defendant's guilt in the felony-murder charge. Since defendant was found guilty of involuntary manslaughter, if this instruction was error, it was harmless. *See State v. Casper*, 256 N.C. 99, 122 S.E. 2d 805 (1961), *cert. denied* 376 U.S. 927, 11 L.Ed. 2d 622, 84 S.Ct. 691 (1964).

[9] Next we consider defendant's argument that the trial court erred in instructing the jury that a verdict of involuntary manslaughter was permissible. Defendant cites *State v. Cates*, 293 N.C. 462, 238 S.E. 2d 465 (1977), for the definition of involuntary manslaughter:

Involuntary manslaughter is the unintentional killing of a human being without malice, premeditation or deliberation which results from the performance of an unlawful act not amounting to a felony or not naturally dangerous to human life; or from the performance of a lawful act in a culpably negligent way; or from the culpable omission to perform some legal duty. . . .

Defendant argues that under the State's theory, defendant and Sammy Guest deliberately set the fire from which the five deaths resulted; thus, the deaths were caused by an unlawful, felonious act. The crime of involuntary manslaughter, being founded upon a non-felonious crime, was, therefore, inconsistent with the evidence and should not have been submitted to the jury.

While we agree that submission to the jury of the offense of involuntary manslaughter was error, we find that it was not prejudicial error. While it is the established rule in North Carolina that the erroneous submission of a lesser-included offense not supported by the evidence is not prejudicial error, *State v. Vestal*, 283 N.C. 249, 195 S.E. 2d 297, *cert. denied*, 414 U.S. 874 (1973), our Supreme Court has qualified this rule by applying a harmless error test to the particular facts and circumstances in each case. *State v. Ray*, 299 N.C. 151, 261 S.E. 2d 789 (1980). In *Ray*, the defendant was charged with first degree murder; at the close of

the evidence, the trial court submitted to the jury verdicts of second degree murder, manslaughter, involuntary manslaughter, not guilty, not guilty by reason of self-defense and defense of another. Defendant was convicted of involuntary manslaughter. All the evidence adduced at trial, however, showed that the defendant intentionally shot the victim; there was evidence of self-defense and defense of another person. In vacating the judgment of the trial court, the court found that if the jury had been required to face squarely the defenses raised by the defendant, there was a reasonable possibility that they would have returned a verdict of not guilty.

> We emphasize that the result reached here should not be read as casting any doubt on the validity of earlier decisions of this Court or of the Court of Appeals. Our decision today does no more than recognize that a verdict based upon the erroneous submission of a lesser included offense not supported by the evidence does not invariably constitute error favorable to a defendant as a matter of law. Whether such an error is harmless depends instead upon the facts and circumstances peculiar to each case. We hold simply that the facts and circumstances peculiar to the instant case warrant a conclusion that, absent the erroneous submission of involuntary manslaughter, there is a reasonable possibility that the jury would have returned a verdict of acquittal. The error complained of was therefore prejudicial to the defendant. G.S. 15A-1442. . . .

*State v. Ray, supra.*

In *State v. Summitt*, 301 N.C. 591, 273 S.E. 2d 425 (1981), defendant, indicted on the charge of first degree rape, complained that the court had erred in submitting to the jury the lesser included offense of second degree rape for which there was no evidence but for which he was convicted. Our Supreme Court stated:

> The harmless error test, other than in constitutional matters, requires a finding of prejudice to a defendant when there is a reasonable possibility that had the error not been committed a different result would have been reached at the trial.

>     . . .

In [the] instant case, defendant's sole defense was that he did not commit the act upon which the greater and lesser offenses were based. There is no contention that there was anything in the charge to the jury which clouded that defense. Thus, the jury's verdict finding him guilty of second-degree rape implicitly, but clearly, rejected his defenses that he did not commit the act upon which the charges were based. When the jury discarded defendant's sole defense, all the evidence pointed to the greater crime of first-degree rape. Therefore, the submission of the lesser-included offense was not prejudicial to defendant but to the contrary was in his favor.

Our conclusion that defendant suffered no prejudice is consistent with *Summitt* and *Ray*. As in *Summitt*, defendant's sole defense here was that he did not commit the act upon which the charges were based. Thus, the jury's verdict finding him guilty of involuntary manslaughter implicitly but clearly rejected his defense that he did not commit the act upon which the charges were based. When the jury discarded defendant's sole defense, all the evidence pointed to the greater crime of felony murder. Therefore, the submission of the lesser included offense of involuntary manslaughter was not prejudicial to defendant, but, on the contrary, was in his favor.

Similarly, we reject defendant's contention that the jury's inconsistent verdicts were prejudicial to him. We believe that " 'the jury, by an act of grace,' has found . . . [the defendant] guilty of a lesser offense". *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431 (1956).

[10] Defendant contends further that his conviction of involuntary manslaughter and unlawful burning arising out of the same transaction constituted double jeopardy. Defendant is attempting to broaden the merger doctrine of felony-murder which provides that if a defendant is convicted of first degree murder on the felony-murder doctrine, he cannot be convicted of both the underlying felony and the first degree murder charge which relied on that felony to supply premeditation. *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981). If defendant had been convicted of felony murder instead of involuntary manslaughter, the guilty verdict on the unlawful burning charge would have to be ar-

rested. *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). Since this was not the situation in defendant's case, we overrule this assignment.

## VI.

The final assignment of error which we consider is defendant's contention that the trial court erred in denying his motion to dismiss on the grounds that there was insufficient evidence to go to the jury. On defendant's motion to dismiss, the State is entitled to the benefit of every reasonable inference arising from the evidence. *State v. McKinney*, 288 N.C. 113, 215 S.E. 2d 578 (1975). There was sufficient evidence for the jury to consider each charge for which defendant was convicted and sentenced. The trial court did not err in denying defendant's motion.

Defendant was given a fair trial, free from prejudicial error.

No error.

Chief Judge MORRIS and Judge VAUGHN concur.