STATE OF NORTH CAROLINA
v.
PAUL EVAN SEELIG, Defendant

No. COA12-442

Filed 19 March 2013

1. **Indictment and Information—obtaining property by false pretenses—allegations sufficient—indictment not facially defective**

    Indictments underlying defendant's twenty-three convictions for obtaining property by false pretenses in a case involving the sale of allegedly gluten-free products were not facially defective. The allegations in the indictments were sufficient to raise a reasonable inference that defendant, who was expressly alleged to have obtained value from the victim by means of a false pretense, was also the person who made the false representation that the products contained no gluten.

2. **Constitutional Law—confrontation of witnesses—video testimony—important state interest—reliable testimony—no structural error**

    The trial court did not violate defendant's rights under the Confrontation Clauses of the federal and state constitutions in an obtaining property by false pretenses case by permitting a witness to testify by way of a live, two-way, closed-circuit internet broadcast from Nebraska. Under the controlling test set out in *Maryland v. Craig*, 497 U.S. 836 (1990), the trial court did not err in allowing the live video testimony as it was necessary to further an important state interest and the reliability of the testimony was assured. Further, the admission of the testimony was not structural error.

3. **Crimes, Other—obtaining property by false pretenses—sufficient evidence—no fatal variance**

STATE v. SEELIG

[226 N.C. App. 147 (2013)]

The trial court did not err in an obtaining property by false pretenses case by denying defendant's motion to dismiss the charges. The State presented substantial evidence that the products defendant sold to each of thirteen victims who did not submit samples for laboratory testing contained gluten. Further, the State presented substantial evidence defendant attempted to obtain value from a victim by false pretenses. Additionally, there was no fatal variance between the indictment and evidence presented at trial as the indictment need not have alleged, and the State need not have proven, that defendant intended to defraud any particular person, and the State's evidence was not inconsistent with a bill of particulars.

**4. Appeal and Error—preservation of issues—Constitutional Law—double jeopardy—Rule 2 not invoked**

Defendant's argument the State violated his right to be free from double jeopardy for obtaining property by false pretenses was not preserved at trial where the record contained no indication that defense counsel specifically argued the double jeopardy issue to the trial court. The Court of Appeals declined to invoke Rule 2 of the North Carolina Rules of Appellate Procedure to review the issue where the record on appeal did not contain all the materials necessary to determine defendant's double jeopardy claim.

**5. Appeal and Error—preservation of issues—inadequate record on appeal—constitutional law—effective assistance of counsel**

Defendant's argument that he did not receive effective assistance of counsel during the plea bargaining process in an obtaining property by false pretenses case was dismissed without prejudice to defendant's filing a motion for appropriate relief in the trial court. Defense counsel conceded that the record before the Court of Appeals was inadequate to address the issue, and the issue was raised on direct appeal for preservation purposes only.

Appeal by defendant from judgments entered 12 April 2011 by Judge Carl R. Fox in Wake County Superior Court. Heard in the Court of Appeals 15 November 2012.

*Attorney General Roy Cooper, by Special Deputy Attorney General I. Faison Hicks and Special Deputy Attorney General Anne J. Brown, for the State.*

*Edward Eldred for defendant-appellant.*

GEER, Judge.

Defendant Paul Evan Seelig appeals from 23 convictions of obtaining property by false pretenses. On appeal, defendant primarily argues that his rights under the Confrontation Clauses of the federal and state constitutions were violated when the trial court permitted a witness to testify by way of a live, two-way, closed-circuit internet broadcast from Nebraska. We hold that under the controlling test set out in *Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990), the trial court did not err in allowing the live video testimony.

## Facts

The State's evidence tended to show the following facts. Defendant was the owner of Great Specialty Products, a company that sold, among other things, bagels, breads, and other baked edible goods (collectively "bread products") that were advertised as homemade and gluten free. Gluten is a protein found in wheat, barley, and rye. Some people, including people diagnosed with celiac disease, are gluten intolerant because their bodies recognize gluten as a foreign substance and create antibodies that actually work to damage the body.

When people with gluten intolerance ingest gluten, their symptoms include abdominal bloating, indigestion, abdominal cramping and pain, diarrhea, vomiting, acidosis, and fatigue. For some, but not all, people with celiac disease, ingesting even a very small amount of gluten can cause these symptoms. People who are gluten intolerant are treated by working with nutritionists to maintain gluten-free diets; there is no medication to treat celiac disease.

Defendant began selling his bread products — represented as gluten free — in August 2009. He operated out of a booth at the flea market located on the State Fairgrounds in Raleigh, North Carolina. Defendant next sold the bread products from a booth at the 2009 State Fair in Raleigh. During the fall of 2009 and early 2010, defendant also sold the bread products online from a "Great Specialty Products" website. He delivered the products to customers' homes anywhere within a 40-minute drive from Morrisville, North Carolina.

None of the bread products advertised by defendant as gluten free were actually gluten free. Defendant bought all of the bread products either completely premade or in a partially-baked, frozen form that only needed to be baked briefly in the oven. Many, but not all, of the bread products sold on defendant's website as gluten free were manufactured by Tribecca Oven, a New Jersey bakery. Because gluten is integral to

Tribecca Oven's manufacturing process, a witness from Tribecca Oven described the company as a "gluten machine" and testified that all of the bread products manufactured by Tribecca Oven contain gluten.

All of the bagels and some of the other products defendant represented as homemade and gluten free were purchased from Sam's, Costco, or BJ's. The remainder of the bread products were delivered by truck to defendant's home. None of the products received or purchased by defendant for resale bore labels indicating they were gluten free. The premade bread products were simply repackaged for sale by defendant. The products purchased in a frozen, partially-baked form were briefly baked in an oven and then packaged for sale by defendant. Laboratory testing on 12 of 13 samples of bread products sold by defendant and advertised as gluten free indicated that those samples contained gluten.

During the fall of 2009 and early 2010, defendant or one of his employees sold bread products to at least 23 persons who would not have purchased the products if the products had not been advertised as gluten free. Many of those persons either had celiac disease or were purchasing the products for a person with celiac disease. At least one of those individuals filed a complaint with the North Carolina Department of Justice. The North Carolina Department of Agriculture and Consumer Services investigated defendant and filed a civil action against him seeking permanent injunctive relief. The Department of Agriculture obtained a temporary restraining order against defendant pending a hearing on a preliminary injunction. The record does not contain any further information regarding that civil action.

On 6 April 2010, defendant was indicted for nine counts of obtaining property by false pretenses. On 9 November 2010, defendant was indicted for an additional 19 counts of obtaining property by false pretenses. At trial, defendant testified that he never advertised or sold products as gluten free that he knew, in fact, contained gluten. Defendant claimed he purchased all of his gluten-free products from "Rise 'n Bakeries," an Amish bread products manufacturer located in Millsburg, Ohio. He purchased regular bread products from other companies. According to defendant, none of his bread products or bagels were bought at Costco, Sam's, or BJ's. Defendant testified he regularly performed tests on the products he sold as gluten free to ensure that they were, in fact, gluten free.

Defendant further testified that as of 22 December 2009, defendant believed there may have been cross-contamination at some point during the production process of his bread products such that the end product

was not actually gluten free. Defendant promptly notified his customers and began printing labels on the products warning that they may have been contaminated with gluten.

Defendant also presented the testimony of one of his customers, Sharon Hargraves. Ms. Hargraves testified that she has celiac disease, she purchased bread products from defendant throughout the fall of 2009, and she showed no symptoms of having ingested gluten.

At trial, the State dismissed four counts of obtaining property by false pretenses, and the trial court dismissed an additional count of obtaining property by false pretenses on defendant's motion at the close of all the evidence. The jury found defendant guilty of 23 counts of obtaining property by false pretenses. Defendant then pled guilty to the aggravating factor that he took advantage of a position of trust or confidence to commit the offenses.

The trial court consolidated the convictions into 11 judgments. In each judgment, the court sentenced defendant to an aggravated-range term of 10 to 12 months imprisonment and further ordered that all of the sentences run consecutively. Defendant's written notice of appeal was not timely, but this Court granted defendant's petition for writ of certiorari.

I

**[1]** Defendant first argues that the indictments underlying his 23 convictions for obtaining property by false pretenses were facially defective. "[W]here an indictment is alleged to be invalid on its face, thereby depriving the trial court of its jurisdiction, a challenge to that indictment may be made at any time, even if it was not contested in the trial court." *State v. Wallace*, 351 N.C. 481, 503, 528 S.E.2d 326, 341 (2000). "On appeal, we review the sufficiency of an indictment *de novo*." *State v. McKoy*, 196 N.C. App. 650, 652, 675 S.E.2d 406, 409 (2009).

Each of the indictments at issue alleged the following:

> [O]n or about [date(s) of offense], in Wake County the defendant named above unlawfully, willfully and feloniously did knowingly and designedly with the intent to cheat and defraud, obtain US Currency, having a value of [monetary value] from [name of the victim], by means of a false pretense which was calculated to deceive and did deceive.
>
> The false pretense consisted of the following: The defendant sold bread products to the victim that were

advertised and represented as Gluten Free when in fact the defendant knew at the time that the products contained Gluten. This act was done in violation of N.C.G.S. 14-100.

Obtaining property by false pretenses consists of four elements: "(1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another." *State v. Cronin*, 299 N.C. 229, 242, 262 S.E.2d 277, 286 (1980). "[A]n indictment must allege every element of an offense . . . ." *State v. Kelso*, 187 N.C. App. 718, 722, 654 S.E.2d 28, 31 (2007).

Defendant contends that the indictments fail to sufficiently allege that he made a false representation because they do not allege either "that [defendant] himself 'advertised and represented' the bread products as gluten-free or that [defendant] was the agent of the entity that 'advertised and represented' the products as gluten-free." Defendant points to the indictments' use of the passive voice — "defendant sold bread products to the victim that were advertised and represented as Gluten Free" — and argues that because this language does not explicitly allege that defendant made the misrepresentations, the indictments are fatally defective. We disagree.

In *Cronin*, the defendant challenged the sufficiency of his indictment for obtaining property by false pretenses because, in part, it failed to directly allege "that defendant did in fact deceive the [victim bank]," a necessary element of the offense. 299 N.C. at 236, 262 S.E.2d at 282. The Court explained that the indictment at issue "alleged that defendant knowingly and falsely made false representations to the bank that he was offering as security for a loan a new mobile home having value of $10,850, when actually the offered security was a fire-damaged mobile home of the value of $2,500, and that defendant by means of such false pretense and with intent then and there to defraud the bank received from the bank the sum of $5,704.54." *Id.* at 238, 262 S.E.2d at 283. In concluding that the indictment was adequate, the Court explained: "If the false pretense caused the victim to give up his property, it logically follows that the property was given up because the victim was in fact deceived by the false pretense." *Id.* Thus, the Court upheld the indictment since the allegations were "sufficient to raise a *reasonable inference* that the bank made the loan because it was deceived by defendant's false representations." *Id.* (emphasis added).

In this case, the indictments allege that defendant "*did . . . obtain*

US Currency, having a value of [monetary value] from [name of the victim], *by means of a false pretense* which was calculated to deceive and did deceive." (Emphasis added.) The indictments, therefore, allege that defendant, and not some other person or entity, employed a false pretense to obtain money from the alleged victims. The indictments then specifically describe the false pretense used by defendant as follows: "*The defendant sold* bread products to the victim *that were advertised and represented* as Gluten Free which in fact *the defendant knew* at the time that the products contained Gluten." (Emphasis added.)

We conclude that, as in *Cronin*, the allegations in the indictments were "sufficient to raise a reasonable inference" that defendant, who was expressly alleged to have obtained value from the victim *by means of* a false pretense, was also the person who made the false representation that the products contained gluten. *Id. Cf. State v. Sturdivant*, 304 N.C. 293, 310, 283 S.E.2d 719, 731 (1981) (rejecting defendant's facial challenge to indictment for kidnapping based on argument that indictment failed to indicate kidnapping was accomplished without victim's consent, in part, because indictment stated defendant " '*unlawfully and wilfully did feloniously kidnap*' " and " '*unlawfully restrain[]*' " victim and "common sense dictates that one cannot unlawfully kidnap or unlawfully restrain another with his consent").

Defendant, however, points to *State v. Whedbee*, 152 N.C. 770, 67 S.E. 60 (1910). There, the Court reviewed the sufficiency of an indictment for obtaining property by false pretenses and stated that an indictment "must directly and distinctly aver every fact or circumstance that is essential, and it cannot be helped out by the evidence at the trial, or be aided by argument and inference." *Id.* at 774, 67 S.E. at 62 (internal quotation marks omitted). To the extent the *Whedbee* Court precluded reliance on inferences in reviewing indictments, that aspect of the opinion has been effectively overruled by *Cronin*. Under *Cronin*, the indictments in this case are facially valid.

II

**[2]** Defendant next contends that the trial court's admission of Sean Kraft's testimony from another state via "live closed-circuit web broadcast" violated defendant's rights under the Confrontation Clauses contained in the Sixth Amendment to the Constitution of the United States and Article I, Section 23 of the Constitution of North Carolina. Mr. Kraft testified regarding the results of laboratory tests he performed on samples of defendant's bread products.

Defendant concedes that he failed to object at trial to the admission

of Mr. Kraft's testimony on the grounds that the testimony "violated the confrontation clause's face-to-face guarantee" and argues plain error. For this Court to find plain error,

> a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice – that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations and quotation marks omitted). "We review *de novo* whether the right to confrontation was violated." *State v. Jackson*, 216 N.C. App. 238, 241, 717 S.E.2d 35, 38 (2011), *appeal dismissed and disc. review denied*, ___ N.C. ___, 720 S.E.2d 681, *cert. denied*, ___ U.S. ___, 184 L. Ed. 2d 81, 133 S. Ct. 164 (2012).

The Confrontation Clause contained in the Sixth Amendment to the federal constitution, enforceable against the States through the Fourteenth Amendment, "protects the fundamental right of an accused 'to be confronted with the witnesses against him.' " *Id.* (quoting U.S. Const. amend. VI). "The elements of confrontation include the witness's: physical presence; under-oath testimony; cross-examination; and exposure of his demeanor to the jury." *Id.* "The physical presence, or 'face-to-face,' requirement embodies the general Confrontation Clause protection of an accused's 'right [to] physically face those who testify against him.' " *Id.* (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 94 L. Ed. 2d 40, 53, 107 S. Ct. 989, 998 (1987)). "But, this general rule 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Id.* (quoting *Mattox v. United States*, 156 U.S. 237, 243, 39 L. Ed. 409, 411, 15 S. Ct. 337, 340, (1895)).

In this case, the State contends *State v. Jeffries*, 55 N.C. App. 269, 271-74, 285 S.E.2d 307, 309-11 (1982), is controlling. In *Jeffries*, during the sixth week of the trial, direct examination of the State's final witness was interrupted by an evening recess and, afterwards, the witness was admitted into the hospital for a coronary condition. *Id.* at 283, 285 S.E.2d at 316-17. The witness' treating physician told the trial court that the witness could not return for at least two weeks but that the witness could

testify by way of videotape. *Id.* at 283-84, 285 S.E.2d at 317. The trial court allowed the videotaping of the testimony. *Id.* at 284, 285 S.E.2d at 317.

On appeal, the defendant challenged the admission of videotaped testimony based on his right to confrontation. *Id.* This Court held that videotaped testimony did not violate a defendant's right to confrontation if it was admitted under carefully controlled conditions:

> First, there must be exceptional circumstances necessitating the procedure. . . . [T]he witness must be unavailable to testify within a period of time after which the trial itself would be subject to mistrial. The videotaped session must be under the control and supervision of the trial judge, and the defendant and his attorney must be allowed to attend. Effective cross-examination by defendant must be unimpeded, and all measures must be taken to eliminate possible prejudicial effects due to location or condition of the witness. Furthermore, the videotape shown to the jury must be clear, allowing the jurors to observe clearly the demeanor of the witness.

*Id.* at 287, 285 S.E.2d at 318. The Court ultimately concluded that all of these requirements were met and, therefore, the defendant had failed to show any violation of his right to confrontation when the witness testified via videotape. *Id.*, 285 S.E.2d at 318-19.

Subsequent to *Jeffries*, however, the United States Supreme Court decided *Craig*, which addressed the constitutionality of a Maryland statute that allowed for alleged child abuse victims to testify by way of live, one-way closed circuit television. 497 U.S. at 840-42, 111 L. Ed. 2d at 675-76, 110 S. Ct. at 3160-61. The Court held: "[A] defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850, 111 L. Ed. 2d at 682, 110 S. Ct. at 3166.

The Court stressed that "[t]he critical inquiry . . ., therefore, is whether use of [one-way closed circuit television] is necessary to further an important state interest." *Id.* at 852, 111 L. Ed. 2d at 682, 110 S. Ct. at 3167. The Court then held that "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such

cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Id.* at 855, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169.

Whether use of a procedure that fails to provide face-to-face confrontation is necessary to further the important state interest must be decided on a case-by-case basis. *Id.* To decide the "necessity" question, the trial court must hold an evidentiary hearing and make case-specific findings as to the necessity of allowing the witness to testify outside of the defendant's physical presence in order to fulfill the important state interest. *Id.* at 855-56, 111 L. Ed. 2d at 685, 110 S. Ct. at 3169.

The *Craig* Court then reviewed the statutory procedure at issue to determine whether it assured the reliability of the testimony. The Court pointed out that although the child witness was unable to see the defendant, the existence of the "other elements of confrontation — oath, cross-examination, and observation of the witness' demeanor — adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851, 111 L. Ed. 2d at 682, 110 S. Ct. at 3166. Ultimately, the Court determined:

> Because there is no dispute that the child witnesses in this case testified under oath, were subject to full cross-examination, and were able to be observed by the judge, jury, and defendant as they testified, we conclude that, to the extent that a proper finding of necessity has been made, the admission of such testimony would be consonant with the Confrontation Clause.

*Id.* at 857, 111 L. Ed. 2d at 686, 110 S. Ct. at 3170.

Because *Jeffries* pre-dates *Craig*, we hold that *Craig* replaced the test set out by this Court in *Jeffries* and is the controlling test to determine the admissibility of witness testimony absent face-to-face confrontation at trial.[1] As this Court has previously held in *Jackson*, 216 N.C. App. at 244, 717 S.E.2d at 40, the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 60, 158 L. Ed. 2d 177, 198, 124 S. Ct. 1354, 1369 (2004), did not address the face-to-face aspect of confrontation and did not overrule *Craig*.

Courts in other jurisdictions have, subsequent to *Crawford*,

---

1. We note, though, that the *Jeffries* test bears a strong similarity to the *Craig* analysis.

continued to apply the *Craig* test in determining whether a defendant's confrontation right was violated by a witness' live, two-way video testimony at trial. *See, e.g., United States v. Yates*, 438 F.3d 1307, 1313 (11th Cir. 2006) (holding in conspiracy and fraud case that "*Craig* supplies the proper test for admissibility of two-way video conference testimony"); *People v. Wrotten*, 14 N.Y.3d 33, 40, 923 N.E.2d 1099, 1103 (2009) (relying on *Craig* to hold "public policy of justly resolving criminal cases while at the same time protecting the well-being of a witness can require live two-way video testimony in the rare case where a key witness cannot physically travel to court in New York and where, as here, defendant's confrontation rights have been minimally impaired"); *Bush v. State*, 193 P.3d 203, 215-16 (Wyo. 2008) (applying *Craig* test to determine that two-way video conferencing testimony of witness was necessary to meet important public interest because witness was located in another state and too ill to travel); *State v. Johnson*, 195 Ohio App. 3d 59, 74-76, 958 N.E.2d 977, 989-91 (2011) (applying *Craig* test to determine admissibility of testimony via two-way, closed-circuit television when necessary because of defendant's family's intimidation of witnesses), *appeal not allowed*, 131 Ohio St. 3d 1437, 960 N.E.2d 987 (2012).

Here, the first question is whether allowing Mr. Kraft to testify through a two-way, closed circuit web broadcast was necessary to further an important state interest. Other jurisdictions have found important state interests outside the child abuse victim context specifically addressed in *Craig*, including the interest in protecting a witness' health while also expeditiously and justly resolving a criminal proceeding. *See, e.g., Horn v. Quarterman*, 508 F.3d 306, 319-20 (5th Cir. 2007) (finding requisite state interest for use of two-way closed circuit television when necessary to "protect[] the witness . . . from physical danger or suffering" because of witness' illness and inability to travel); *Harrell v. State*, 709 So. 2d 1364, 1369-70 (Fla. 1998) (recognizing important state interest in "expeditiously and justly resolv[ing] criminal matters that are pending in the state court system" when witness "was in poor health and could not make the trip to this country"); *Wrotten*, 14 N.Y.3d at 40, 923 N.E.2d at 1103 (holding that "the public policy of justly resolving criminal cases while at the same time protecting the well-being of a witness can require live two-way video testimony in the rare case where a key witness cannot physically travel to court in New York and where, as here, defendant's confrontation rights have been minimally impaired"); *Bush*, 193 P.3d at 215-16 (holding important state interest was "preventing further harm to [the witness'] already serious medical condition" given that recess to allow witness to recover would not be appropriate because recovery

would take "a long time"). *See also Johnson*, 195 Ohio App. 3d at 75, 958 N.E.2d at 989-90 (holding that "trial court's use of the two-way video procedure was necessary to further the public policy of justly resolving the criminal case, while at the same time protecting the well-being of the state's witnesses" who had been intimidated by defendant's family).

This case, like those in other jurisdictions, implicates the State's interest in justly and efficiently resolving a criminal matter when a witness cannot travel because of his health. The trial court, as required by *Craig*, conducted a hearing and found that Mr. Kraft had a history of panic attacks, had suffered a severe panic attack on the day he was scheduled to fly from Nebraska to North Carolina for trial, was hospitalized as a result, and was unable to travel to North Carolina because of his medical condition.

Defendant challenges the trial court's finding that Mr. Kraft's medical condition was caused by a fear of travelling, rather than a general fear of testifying in court. Mr. Kraft's voir dire testimony, however, supported the trial court's finding that his inability to travel was due to a medical condition and was not simply a general fear of testifying. We may not, therefore, revisit that finding. It was up to the trial court — and not this Court — to determine the credibility of Mr. Kraft's claim that he could not travel due to his health. Consequently, the trial court's findings were sufficient to establish that allowing Mr. Kraft to testify by way of live two-way video was necessary to meet an important state interest.

Turning to *Craig*'s second requirement — that the reliability of the testimony be assured — the trial court, in this case, found that the deputy clerk of court had administered the oath to Mr. Kraft via the two-way video feed and that the court had impressed upon Mr. Kraft that Mr. Kraft's failure to give truthful answers "could subject him to prosecution for the felony of perjury, a Class F felony, with a maximum possible punishment of 50 months imprisonment." The trial court also made the following findings regarding the process employed:

> That the videotaped [sic] session will be under the control of the trial judge and the Defendant and his attorney are present and will be present during the presentation of his testimony.
>
> That effective cross-examination by the Defendant will be unimpeded in this case and that all measures have been taken to eliminate any possible prejudice due to the location and conditions of the witness, and that the

> presentation of the witness's testimony will be clear and presented live to the jury in this case as the witness testifies and offers evidence in this case.

It appears from the record that Mr. Kraft's examination was carried out as specified in the court's finding. Defendant conducted a brief cross-examination of Mr. Kraft, and defendant and the jury could view Mr. Kraft while Mr. Kraft testified.

Thus, like the witnesses in *Craig*, Mr. Kraft "testified under oath, w[as] subject to full cross-examination, and w[as] able to be observed by the judge, jury, and defendant as [he] testified." *Craig*, 497 U.S. at 857, 111 L. Ed. 2d at 686, 110 S. Ct. at 3170. Accordingly, the *Craig* test was satisfied here, and the trial court did not err in admitting Mr. Kraft's testimony.

Defendant further contends that admission of Mr. Kraft's testimony was structural error and error per se. "Structural error is a rare form of constitutional error resulting from structural defects in the constitution of the trial mechanism which are so serious that a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *State v. Garcia*, 358 N.C. 382, 409, 597 S.E.2d 724, 744 (2004) (internal quotation marks omitted). "[A] defendant's remedy for structural error is not dependent upon harmless error analysis; rather, such errors are reversible *per se*." *Id.* "North Carolina courts also apply a form of structural error known as error per se[,]" and "[l]ike structural error, error per se is automatically deemed prejudicial and thus reversible without a showing of prejudice." *Lawrence*, 365 N.C. at 514, 723 S.E.2d at 331, 332.

Because we hold that the admission of Mr. Kraft's testimony was not error, we need not reach the arguments that admission of the testimony was such serious error that it constituted structural error or error per se not requiring a showing of prejudice. Likewise, without error, defendant cannot establish the prejudice necessary to support his claim that he received ineffective assistance of counsel when his trial counsel failed to object to admission of Mr. Kraft's testimony based on the face-to-face aspect of defendant's right to confrontation. *See State v. Pratt*, 161 N.C. App. 161, 165, 587 S.E.2d 437, 440 (2003) ("A successful ineffective assistance of counsel claim based on a failure to request a jury instruction requires the defendant to prove that without the requested jury instruction there was plain error in the charge.").

### III

**[3]** Defendant next argues that the trial court erred in denying his motions to dismiss. "This Court reviews the trial court's denial of a motion to dismiss *de novo.*" *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' " *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (quoting *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted . . . in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994).

First, defendant contends that the State failed to present substantial evidence that the bread products he sold to 13 of the alleged victims contained gluten because the State did not produce evidence that those bread products were subjected to chemical tests showing they contained gluten. Defendant asserts that the only evidence produced by the State that the bread products purchased by those 13 individuals contained gluten was unreliable lay testimony that after eating the bread products, people with gluten intolerances suffered symptoms that they had suffered on prior occasions upon eating gluten.

Defendant has overlooked the testimony of defendant's former employee, Ms. Mills, who testified to the following. She worked for defendant from April 2008 to December 2009, including when defendant sold bread products at the flea market, at the 2009 State Fair, and through his website. According to Ms. Mills, other than certain products delivered by truck, all the bread products sold by defendant were purchased from Costco, BJ's, or Sam's. All of the bagels sold by defendant were "common brand" bagels purchased from Costco, Sam's, or BJ's. Ms. Mills testified that none of the bread products purchased by defendant and ultimately resold bore labels stating that the products were gluten free.

In addition, a representative of Tribecca Oven testified that many, although not all, of the bread products sold on defendant's website as gluten free were manufactured by Tribecca Oven. Tribecca Oven sells its

products in a partially-baked, frozen form. The representative confirmed that all bread products manufactured by Tribecca Oven contain gluten.

In addition, the State presented evidence that laboratory technicians employed by the University of Nebraska's Food Allergy Research and Resource Program ("FARRP"), including Mr. Kraft, performed laboratory tests on 13 samples of food products sold by defendant as gluten free, and that all but one of those samples contained a gluten content of greater than 5,000 parts per million. One of the State's experts testified that while the Food and Drug Administration has not provided a definition for "gluten free" in the United States, European countries have specified that products are "gluten free" when they have a gluten content of less than 20 parts per million.

The laboratory tests were performed on samples of one or more bread products submitted by seven of defendant's alleged victims. With respect to the sole sample that did not test positive for gluten, the State's experts further testified that if the sample had fermented prior to testing, it was possible that the test would not detect high levels of gluten even though they were present.

Finally, the victims who did not submit samples for testing provided lay testimony regarding symptoms they or a person for whom they bought defendant's bread products experienced after eating the products. The victims testified that they or the person for whom they bought the products had celiac disease, a wheat allergy, or were gluten intolerant; they attempted to maintain a gluten-free diet; and, upon eating defendant's products, they experienced symptoms consistent with eating gluten, including one or more of the following symptoms: nausea, vomiting, diarrhea, stomach pain, fatigue, insomnia, thyroid problems, bloating, cramping, headaches, tiredness, digestion problems, depression, and skin rash.

The State's evidence that all of defendant's products were purchased either completely premade or in a partially-baked, frozen form, that none of the products bore labels stating they were gluten free, and that many of the products were manufactured by Tribecca Oven and, therefore, contained gluten, was evidence tending to show that none of defendant's products were gluten free. We hold that this evidence, combined with the laboratory test results from samples submitted by other victims and the lay testimony of victims describing the symptoms they or others suffered after eating defendant's products, constituted substantial evidence that the products defendant sold to each of the victims who did not submit samples for laboratory testing contained gluten.

Defendant also contends that his motion to dismiss the charge that he obtained property by false pretenses from Tara Muller was erroneously denied because the State's evidence showed that Ms. Muller gave defendant a check for her purchase of bread products but that defendant returned the check to Ms. Muller without cashing it. Defendant argues that he, therefore, ultimately obtained no value from Ms. Muller. Defendant's argument fails to recognize that, under N.C. Gen. Stat. § 14-100(a) (2011), obtaining property by false pretenses can be proven by evidence that the defendant "obtain[ed] or *attempt[ed] to obtain* from any person within this State any . . . thing of value." (Emphasis added.) *See also Cronin*, 299 N.C. at 242, 262 S.E.2d at 286 (holding element of obtaining property by false pretenses is making a false representation "by which one person obtains or attempts to obtain value from another"). The State's evidence tending to show defendant obtained the check, but ultimately returned the check upon a complaint by Ms. Muller that she became ill after eating the bread products, was sufficient to show defendant attempted to obtain value from Ms. Muller by false pretenses.

To the extent that defendant argues in his brief that the State's evidence fatally varied from the allegations in the indictment because the indictment alleged that defendant obtained "US Currency" from Ms. Muller rather than a check, that argument was not made below and has, therefore, not been preserved for appellate review. *See State v. Pickens*, 346 N.C. 628, 645, 488 S.E.2d 162, 172 (1997) ("Regarding the alleged variance between the indictment and the evidence at trial, defendant based his motions at trial solely on the ground of insufficient evidence and thus has failed to preserve this argument for appellate review.").

Finally, defendant additionally argues that his motion to dismiss the charge that he obtained property by false pretenses from Amee Wojdyla was erroneously denied because the indictment specifically alleged that defendant obtained value from Ms. Wojdyla, but the State's evidence showed only that defendant obtained value from Ms. Wojdyla's husband. "[T]he evidence in a criminal case must correspond to the material allegations of the indictment, and where the evidence tends to show the commission of an offense not charged in the indictment, there is a fatal variance between the allegations and the proof requiring dismissal." *State v. Williams*, 303 N.C. 507, 510, 279 S.E.2d 592, 594 (1981).

"[A]n indictment 'must allege lucidly and accurately all the essential elements of the offense endeavored to be charged.' " *State v. Hunt*, 357 N.C. 257, 267, 582 S.E.2d 593, 600 (2003) (quoting *State v. Greer*, 238 N.C. 325, 327, 77 S.E.2d 917, 919 (1953)). In order to be fatal, a variance must relate to "an essential element of the offense." *Pickens*, 346 N.C. at 646,

488 S.E.2d at 172. Alternately, "[w]hen an averment in an indictment is not necessary in charging the offense, it will be 'deemed to be surplusage.' " *Id.* (quoting *State v. Stallings*, 267 N.C. 405, 407, 148 S.E.2d 252, 253 (1966)).

An indictment for obtaining property by false pretenses need not allege the name of any particular victim because N.C. Gen. Stat. § 14-100(a) "does not require that the State prove 'an intent to defraud any particular person.' " *State v. McBride*, 187 N.C. App. 496, 501, 653 S.E.2d 218, 222 (2007) (quoting N.C. Gen. Stat. § 14-100(a) (2005)). Indeed, N.C. Gen. Stat. § 14-100(a) specifically provides:

> [I]t shall be sufficient in any indictment for obtaining or attempting to obtain any such money, goods, property, services, chose in action, or other thing of value by false pretenses to allege that the party accused did the act with intent to defraud, *without alleging an intent to defraud any particular person, and without alleging any ownership of the money, goods, property, services, chose in action or other thing of value*; and upon the trial of any such indictment, it shall not be necessary to prove either an intent to defraud any particular person or that the person to whom the false pretense was made was the person defrauded, *but it shall be sufficient to allege and prove that the party accused made the false pretense charged with an intent to defraud.*

(Emphasis added.)

Since an indictment need allege only an intent to defraud and need not allege any person's ownership of the thing of value obtained by the false pretense, when the indictment includes the name of the victim, that allegation is surplusage and any variation between the allegations in the indictment and the evidence at trial as to the name of the victim is not fatal. *See State v. Salisbury Ice & Fuel Co.*, 166 N.C. 366, 367, 81 S.E. 737, 737 (1914) (holding that no fatal variance occurred with respect to indictment charging defendant with obtaining property by false pretenses from different person than proved at trial because "[t]he charge as to the persons intended to be cheated was . . . surplusage and immaterial").

Defendant nonetheless cites *State v. Loudner*, 77 N.C. App. 453, 335 S.E.2d 78 (1985), in support of his argument. There, the defendant was convicted of engaging in a sex act with a person in his custody in violation of N.C. Gen. Stat. § 14–27.7. *Id.* at 453, 335 S.E.2d at 79. On appeal,

the Court held that there was a fatal variance between the indictment and the evidence at trial because the indictment alleged that the "defendant engaged 'in a sexual act, to wit: performing oral sex' on the child involved" and the bill of particulars identified only oral sex as the sexual act involved, but "the State's evidence showed only that the defendant placed his finger in her vagina, which by definition is a separate sex offense under the terms of G.S. 14–27.1(4)." *Id.*

The essential elements of the offense at issue in *Loudner* were "that the defendant had (1) assumed the position of a parent in the home, (2) of a minor victim, and (3) engaged in a sexual act with the victim residing in the home." *State v. Oakley*, 167 N.C. App. 318, 322, 605 S.E.2d 215, 218 (2004). Thus, unlike the name of the victim in the present case, the performance of the sexual act *was* an essential element of the offense in *Loudner*. The State was, therefore, bound by the allegation in the indictment and the bill of particulars regarding the essential element even though it was not required to specifically identify the actual sex act in the indictment. *Loudner*, 77 N.C. App. at 454, 335 S.E.2d at 78.

Because (1) the General Assembly has expressly provided that an indictment for obtaining property by false pretenses need not allege and the State need not prove that the defendant intended to defraud any particular person and (2) the State's evidence was not inconsistent with a bill of particulars, *Loudner* does not control. There was no fatal variance, and the trial court properly denied the motion to dismiss.

IV

**[4]** Defendant next contends that the State violated his right to be free from double jeopardy for the same offense because, prior to this criminal action, the North Carolina Department of Agriculture and Consumer Services filed a civil action against defendant seeking injunctive relief. We must first address whether this argument was preserved in the trial court.

Below, defendant, although represented by trial counsel, filed 10 pro se motions to dismiss, three of which included double jeopardy claims. Defendant's trial counsel, however, did not expressly raise the double jeopardy argument. It is well established that " '[h]aving elected for representation by appointed defense counsel, defendant cannot also file motions on his own behalf or attempt to represent himself. Defendant has no right to appear both by himself and by counsel.' " *State v. Williams*, 363 N.C. 689, 700, 686 S.E.2d 493, 501 (2009) (quoting *State v. Grooms*, 353 N.C. 50, 61, 540 S.E.2d 713, 721 (2000)).

Thus, ordinarily, a defendant has no right to file motions pro se while represented by counsel. Nevertheless, this Court has held that a ruling on a pro se motion to dismiss on speedy trial grounds, filed when a defendant was represented by counsel, may be reviewed on appeal if (1) defense counsel argues the speedy trial issue to the trial court and (2) both the State and the trial court consent to addressing the issue. *State v. Howell*, 211 N.C. App. 613, 615, 711 S.E.2d 445, 447-48 (2011), *disc. review denied*, 366 N.C. 392, 732 S.E.2d 486 (2012).

Assuming, without deciding, that *Howell* would also apply to a motion to dismiss based on double jeopardy, defense counsel in this case only referred generally to defendant's motions to dismiss. The record contains no indication that defense counsel ever specifically argued the double jeopardy issue to the trial court. Accordingly, the double jeopardy argument is not properly before this Court. *See Williams*, 363 N.C. at 700-01, 686 S.E.2d at 501 (holding trial court properly refused to rule on defendant's pro se motions filed while he was represented by counsel where counsel did not argue merits of motions to trial court and, instead, merely observed existence of pro se motions and stated " '[w]e need rulings on those' ").

Defendant asks this Court to invoke Rule 2 of the North Carolina Rules of Appellate Procedure to review this issue and cites *State v. Williams*, 201 N.C. App. 161, 689 S.E.2d 412 (2009), in support of his argument. There, this Court reviewed the defendant's double jeopardy argument despite the fact that he failed to properly raise the issue at trial. *Id.* at 172, 689 S.E.2d at 418. However, the record in *Williams* contained all the information needed to determine the double jeopardy issue. *Id.* at 167, 172, 689 S.E.2d at 415, 418.

In this case, because the issue was not specifically raised below, we are lacking the information necessary to properly resolve the issue. The record before us does not include the pleadings from the civil injunctive relief action brought by the Department of Agriculture or any information regarding the final judgment reached in that action. As the record does not contain all the materials necessary to determine defendant's double jeopardy claim, we decline to invoke Rule 2 to reach the issue.

V

[5] Finally, defendant argues he received ineffective assistance of counsel during the plea bargaining process.

It is well established that ineffective assistance of counsel claims brought on direct review will be decided on

the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing. Thus, when this Court reviews ineffective assistance of counsel claims on direct appeal and determines that they have been brought prematurely, we dismiss those claims without prejudice, allowing defendant to bring them pursuant to a subsequent motion for appropriate relief in the trial court.

*State v. Thompson*, 359 N.C. 77, 122-23, 604 S.E.2d 850, 881 (2004) (internal citation and quotation marks omitted). Defendant concedes that "[t]he record before this Court is inadequate to address this issue, and this issue is raised on direct appeal only for preservation issues." Accordingly, we dismiss the claim without prejudice to the defendant's filing a motion for appropriate relief in the trial court.

No error.

Judges STEPHENS and McCULLOUGH concur.