EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Johnny Pérez Núñez<br><br>Recurrido | Certiorari<br><br>2022 TSPR 01<br><br>208 DPR ____ |

Número del Caso: CC-2021-617

Fecha: 12 de enero de 2022

Tribunal de Apelaciones:

    Panel V

Oficina del Procurador General:

    Lcdo. Fernando Figueroa Santiago
    Procurador General

    Lcdo. Omar Andino Figueroa
    Subprocurador General

    Lcda. Lisa Mónica Durán Ortiz
    Procuradora General Auxiliar

 Materia: Resolución con Voto Particular Disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br><br>v.<br><br><br>Johnny Pérez Núñez<br><br>Recurrido | CC-2021-0617 | *Certiorari* |

**RESOLUCIÓN**

En San Juan, Puerto Rico, a 12 de enero 2022.

Examinada la *Petición de certiorari*, presentada por el Procurador General de Puerto Rico el 15 de septiembre de 2021, se provee **no ha lugar**.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emite las expresiones siguientes:

"Estoy de acuerdo con proveer *No Ha Lugar* al certiorari. El Ministerio Público denunció al Sr. Johnny Pérez Núñez (señor Pérez Núñez) por la infracción a los Artículos 93 y 285 del Código Penal de Puerto Rico, 33 LPRA secs. 5142 y 5378, y por violar el Artículo 5.15 de la Ley de Armas de Puerto Rico de 2000, Ley 404-2000, 25 LPRA sec. 458n. El Sr. Jimmy Bonilla Torres (señor Bonilla Torres), testigo de cargo, testificó de manera presencial en la vista preliminar y en la vista preliminar en alzada. Una vez se señaló el caso para juicio, el Ministerio Público solicitó que el señor Bonilla Torres testificara por medio de un sistema de videoconferencia dado que no se encontraba en Puerto Rico y tenía razones de salud que le impedían viajar. Ante la oposición del señor Pérez Núñez, el Tribunal de Primera Instancia celebró una vista de necesidad. Luego de examinar la totalidad de la prueba médica y de haber escuchado los testimonios de dos facultativos médicos, el

Tribunal de Primera Instancia concluyó que el señor Bonilla Torres no tiene una contraindicación médica que le impida trasladarse a Puerto Rico a testificar. El Tribunal de Apelaciones confirmó esa determinación.

Considero que no debemos intervenir con los foros inferiores, sobre todo, cuando el Ministerio Público no derrotó la presunción "de corrección y legalidad en el dictamen". E. Rivera García, *Los criterios de revisión judicial y su aplicación en el sistema acusatorio en Compendio sobre el sistema acusatorio: Experiencias compartidas*, San Juan, Publicaciones Gaviotas, 2019, pág. 321. Máxime cuando "es norma establecida firmemente que los foros revisores no deben intervenir en la apreciación de la prueba hecha por el tribunal revisado en ausencia de pasión, prejuicio, parcialidad o un error manifiesto por parte del juzgador de los hechos". Íd; Pueblo v. Bonilla Romero, 120 DPR 92, 111 (1987).

Estimo que el foro primario no cometió un error manifiesto pues su apreciación no se distancia de la realidad fáctica ni tampoco es inherentemente imposible o increíble. Pueblo v. Irizarry Irizarry, 156 DPR 780, 816 (2002). Ante la omisión de pasión, prejuicio o parcialidad debemos abstenernos de intervenir con la apreciación de la prueba hecha por el juzgador de primera instancia. Después de todo, "[n]o se debe ceder a la tentación dañina de descartar arbitrariamente ni revocar el criterio del foro sentenciador a menos que surja de la prueba admitida que no existe base suficiente que apoye la determinación". E. Rivera García, *op. cit.*, pág. 329. La prueba admitida y creída por el juzgador es suficiente para apoyar la determinación del foro de instancia y para limitar nuestra intervención en este asunto interlocutorio.

El Ministerio Público no pudo probarle al Tribunal de Primera Instancia, organismo que escuchó y examinó el testimonio, la existencia de un cuadro complejo de salud física del señor Bonilla Torres, ni la probabilidad real de agravamiento de su condición preexistente al participar presencialmente en el juicio o

la probabilidad individual o particularizada de que se infecte con el COVID-19 por razón del viaje. Los protocolos del Poder Judicial, las guías de los organismos estatales, la vacunación y las normas actuales esbozadas para atender la emergencia salubrista, apuntan a que una persona prudente y razonable puede protegerse adecuadamente. Este foro no puede caer en la tentación de sustituir el criterio médico creído en el Tribunal de Primera Instancia para llegar a una conclusión predeterminada. Por creer en un debido proceso de ley justo para todas las partes y por entender que la determinación cae dentro de la discreción del juzgador o juzgadora y que fue razonable al amparo de los hechos probados y el derecho aplicable, estoy conforme con el proceder de esta Curia. Esta conclusión es compatible con nuestros pronunciamientos previos y en nada amilana los esfuerzos reiterados y nuestra aprobación del uso de la tecnología para garantizar el acceso a la justicia y la eficiencia en los procesos judiciales."

El Juez Asociado señor Rivera García emitió un voto particular disidente al cual se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Feliberti Cintrón.


                              Javier O. Sepúlveda Rodríguez
                              Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br>Peticionario<br><br>v.<br><br>Johnny Pérez Núñez<br>Recurrido | CC-2021-0617 | *Certiorari* |

**Voto Particular Disidente emitido por el Juez Asociado señor Rivera García al cual se une la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Feliberti Cintrón.**

En San Juan, Puerto Rico, a 12 de enero de 2022.

Por los fundamentos que expongo a continuación, disiento enérgicamente del curso decisorio que hoy optó por seguir una mayoría de este Tribunal al determinar no expedir el recurso de *certiorari* de epígrafe. Al así actuar, esta Curia avala las erradas determinaciones, tanto del Tribunal de Apelaciones como del Tribunal de Primera Instancia, de impedir que cierto testigo del Ministerio Público ——testigo presencial de los hechos—— testifique a través del mecanismo de videoconferencia. Ello, en total contravención a la recomendación médica que hiciera su doctor de cabecera, pues, el testigo fue diagnosticado con fallo cardiaco severo, no reside en Puerto Rico y su comparecencia física en el juicio de autos, además de exacerbarle peligrosamente los niveles

de estrés ——lo que podría generarle la muerte——, lo expondría sustancialmente a un contagio con el COVID-19, por lo que su riesgo de muerte se multiplicaría de manera exponencial.

Estoy convencido de que la mayoría desechó una excelente oportunidad para atender, bajo los parámetros particulares de este caso, un asunto que pone de manifiesto, *vis a vis*, el derecho a la vida con el derecho de confrontación garantizados en nuestra Constitución. Ciertamente, desde mi óptica del significado de justicia, y el orden de prelación y preminencia de los derechos que deben regir en nuestro ordenamiento constitucional, no tengo duda que salvaguardar la vida de una persona es el de más alta jerarquía y comprende, además, nuestro deber ministerial.

Lamentablemente, con el curso de acción tomado por algunos distinguidos compañeros de este Tribunal, hoy se le da la espalda, injustificadamente, a la función justiciera que pretende el Ministerio Público para preservar la salud de, quizás, el testigo de cargo más importante para el esclarecimiento del crimen de autos. Así, la mayoría se aparta de precedentes judiciales federales validados por nuestra jurisprudencia que reconocen la videoconferencia como una herramienta útil para estos tipos de casos. De paso, y en contradicción, echan por la borda elementos esenciales delineados en el

*Plan Estratégico del Poder Judicial de Puerto Rico, 2020-2025: Mapa hacia una justicia de vanguardia*. Específicamente, aludo al objetivo principal de la sección de *Tecnología para la Justicia*, componente que hemos profesado con ahínco y determinación en tiempos recientes. Flaco servicio el que hoy se le hace.

Finalmente, reconoce en su expresión la Jueza Presidenta Oronoz Rodríguez, las determinaciones que hagan los foros inferiores sobre la prueba recibida merecen gran deferencia por parte de los foros revisores. Sin embargo, tras realizar un análisis integral y meticuloso de las particularidades de este caso, no tengo duda alguna que la presente controversia contiene todos los elementos para aplicar la excepción de esta regla general. Ello, toda vez que al realizar un examen justiciero, jurídico y racional de la totalidad de la evidencia recibida en el foro primario, concluimos que nos encontramos ante un error manifiesto del foro de instancia en la apreciación de la prueba. **No debemos perder de perspectiva que la referida doctrina de la deferencia no implica, bajo ningún concepto, un permiso totalitario para que prevalezca una determinación de instancia cuando el foro revisor, luego de un análisis integral, quedó convencido de que se cometió este error. Precisamente, y convenientemente, este fue el análisis que dejó fuera en su escueta expresión la compañera Jueza Presidenta Oronoz Rodríguez.** Pues, se limitó a expresar

que en este caso no se cometió un error manifiesto, pero no discutió la realidad fáctica de los testimonios vertidos en el presente caso para basar tal errada discusión.

En aras de contextualizar mi postura, considero necesario esbozar un breve resumen del tracto procesal del caso.

I

Por hechos ocurridos el 31 de agosto de 2018, el Ministerio Público presentó tres (3) denuncias contra el Sr. Johny Pérez Núñez (señor Pérez Núñez o recurrido), por haber infringido el Artículo 93 del Código Penal de 2012, sobre Asesinato en primer grado;[1] Artículo 285 del Código Penal de 2012, sobre Destrucción de pruebas[2] y el Artículo 5.15 de la Ley de Armas de Puerto Rico de 2000, sobre apuntar y disparar.[3]

La *Vista Preliminar* se celebró el 20 de diciembre de 2018 y, tal cual fue imputado, el Tribunal de Primera Instancia encontró causa probable para acusar por el delito tipificado en el Artículo 5.15 de la Ley de Armas. Sin embargo, por los cargos bajo los Artículos 93 y 285 del Código Penal, el foro primario encontró causa probable en su modalidad de segundo y cuarto grado,

---

[1] 33 LPRA secc. 5142.
[2] 33 LPRA secc. 5378.
[3] Ley 404-2000, 25 LPRA secc. 458n.

respectivamente.[4] Inconforme, el Ministerio Público solicitó una *Vista Preliminar en Alzada* en cuanto al Artículo 93 del Código Penal. Luego de celebrada esta vista el 26 de marzo de 2019, el tribunal de instancia determinó causa probable para acusar por el delito de asesinato en su modalidad de primer grado.[5] El Ministerio Público presentó al Sr. Jimmy Bonilla Torres (señor Bonilla Torres o testigo) como testigo, quien en todo momento cooperó con las autoridades con el fin de esclarecer el acto delictivo. En ambas instancias el testigo declaró presencialmente. No obstante, es extremadamente importante señalar que los dos procesos se realizaron **antes** **de** **que** **se** **decretara** **un** **estado** **de** **emergencia por la pandemia del COVID-19.**

Así las cosas, y una vez se señaló el caso para juicio, el Ministerio Público presentó el 24 de junio de 2020 una *Moción en Solicitud de que un Testigo Testifique por Videoconferencia en el Juicio* en la que, en esencia, solicitó al foro primario que permitiera al señor Bonilla Torres testificar mediante un sistema de videoconferencia de dos vías.[6] Esta petición se fundamentó en que la salud del testigo se vio significativamente afectada luego de haber presenciado el asesinato en cuestión y que bajo las circunstancias actuales de la pandemia, era muy peligroso

---

[4] *Resolución de Vista Preliminar*, Apéndice de la Petición de *certiorari*, pág. 6.

[5] *Resolución de Vista Preliminar en Alzada*, Apéndice de la Petición de *certiorari*, págs. 8-9.

[6] *Moción*, Apéndice de la Petición de *certiorari*, págs. 19-25.

exponer al testigo a comparecer al procedimiento de forma presencial. Señaló, además, que dos semanas después de haber presenciado los hechos, este sufrió un episodio cardiaco que requirió atención médica, y por el cual fue intervenido quirúrgicamente el 26 de septiembre de 2018. El Ministerio Público añadió que, actualmente, el testigo reside en el estado de Texas y es atendido por el Dr. Amhed Ibrahim, cuyo criterio médico experto es que el señor Bonilla Torres no debe exponerse a eventos y situaciones de alto estrés ya que la tensión y ansiedad podrían empeorar su condición cardiaca y resultar en una muerte súbita. Finalmente, arguyó que a la condición de salud que presentaba el testigo debía agregársele el riesgo que implica viajar en estos momentos históricos frente a la pandemia del COVID-19, toda vez que, ante esta emergencia, el testigo estaba ubicado como persona de alto riesgo.

Posteriormente, el 8 de julio de 2020, el acusado presentó una *Oposición a Solicitud del Fiscal para que Testigo Declare Mediante Videoconferencia*.[7] En ella, sostuvo que tenía derecho a la confrontación cara a cara con el testigo y, además, que era necesario que el Ministerio Público entregara el expediente médico del señor Bonilla Torres. También, indicó que era necesario

---

[7] *Moción en Oposición*, Apéndice de la Petición de *certiorari*, págs. 26-29.

evidenciar el riesgo específico que representaba a la salud del testigo una comparecencia física al tribunal.

A esos efectos, el Tribunal de Primera Instancia celebró una *Vista de Necesidad* el 7 de octubre de 2020, con el objetivo de dilucidar la controversia planteada.[8] Como parte de la prueba ofrecida por el Ministerio Público se presentó el expediente médico del testigo el cual incluyó lo siguiente: (1) expediente médico del señor Bonilla Torres en el *University Medical Center* de El Paso, Texas; (2) expediente médico en el *Texas Tech*; (3) expediente médico del Centro Cardiovascular de Arecibo, y (4) expediente médico del testigo en el Manatí Medical Center. De igual forma, en la vista declaró el Dr. Víctor Salgado Bravo (doctor Salgado Bravo o cardiólogo) en calidad de perito del Ministerio Público y el Dr. Pedro Rodríguez Benítez (doctor Rodríguez Benítez) como perito de la defensa.[9]

Surge de la transcripción del procedimiento que el doctor Salgado Bravo, cardiólogo clínico, declaró que evaluó al señor Bonilla Torres en el Hospital Pavía de Arecibo porque presentaba dolor de pecho y falta de aire.[10] Luego de los exámenes de rigor, el cardiólogo diagnosticó al testigo con **fallo cardiaco severo**, toda vez que su ecocardiograma reflejó que el corazón estaba

---

[8] *Minuta*, Apéndice de la Petición de *certiorari*, págs. 31-33.
[9] Íd.
[10] *Transcripción de la Prueba Oral*, Apéndice de la Petición de *certiorari*, pág. 127.

más grande de lo normal y con una fuerza disminuida. Señaló, específicamente, que el músculo cardiaco trabajaba con apenas un treinta por ciento (30%) de fuerza.[11] El doctor Salgado Bravo manifestó, además, que el señor Bonilla Torres fue hospitalizado en el Manatí Medical Center donde se le practicó un cateterismo.[12] Asimismo, le realizaron varios estudios clínicos donde se **confirmó** el limitado funcionamiento del corazón y el agrandamiento del mismo.[13]

Como medida de protección, el médico explicó que le brindó al testigo un chaleco protector porque los pacientes con cardiomiopatía pueden ser propensos a arritmias cardiacas que pueden resultar en **muerte súbita**, esto porque durante una arritmia el corazón deja de latir y con ese chaleco se monitorea, de manera que en caso de que se detecte un episodio de este tipo el dispositivo da un *shock* eléctrico al pecho del paciente.[14] A preguntas del fiscal, declaró que **el evento violento que presenció exacerbó la condición cardiaca** que padecía.[15] Añadió, que en caso de que su condición no mejorara, se le colocaría un desfibrilador, aparato que describió "como un marcapasos".[16] Como parte del seguimiento al paciente, el doctor Salgado Bravo manifestó que **el corazón del señor Bonilla Torres se ha mantenido entre un 20% y 30% de**

---

[11] Íd., pág. 128.
[12] Íd., págs. 131-133.
[13] Íd., pág. 133.
[14] Íd., págs. 133-134.
[15] Íd., págs. 139-140, 150.
[16] Íd., pág. 140.

**capacidad funcional y que, eventualmente, se le implantó un desfibrilador. Puntualizó, también, que aunque el testigo cuenta con el apoyo de otro médico en Estados Unidos, él continúa siendo su cardiólogo principal.**

En cuanto a si recomendaba el traslado del testigo a Puerto Rico, el galeno contestó en la negativa por dos motivos. El primero, porque exponer al testigo a declarar presencialmente frente al acusado en un juicio plenario podría generarle un nivel alto de estrés que pudiera provocarle una **muerte súbita.**[17] Y el segundo motivo, recae sobre la importancia de eliminar o minimizar los riesgos de exposición en espacios cerrados y congestionados por personas, debido a la crisis pandémica y la severa condición cardiaca del señor Bonilla Torres, lo cual lo ubica dentro de la población de personas de alto riesgo de contagio con el COVID-19. El cardiólogo reconoció que, en circunstancias normales, viajar no es una contraindicación si el paciente se mantiene estable. Sin embargo, **un paciente con la condición de salud del testigo podría sufrir complicaciones serias de ser infectado con este mortal virus.**[18] Es por ello, que el cardiólogo recomendó no realizar un viaje en estos momentos y sugirió que declarara mediante

---

[17] Íd., págs. 134-138.
[18] Íd., págs. 144-146.

videoconferencia en aras de salvaguardar su delicado estado de salud.[19]

El acusado, por su parte, presentó el testimonio del doctor Rodríguez Benítez, quien basó su testimonio en la revisión del expediente médico del testigo ya que no lo atendió como paciente. El doctor Rodríguez Benítez **admitió** que el testigo padece de una condición cardiaca conocida como **cardiomiopatía dilatada**.[20] Sostuvo, que mientras el testigo estaba bajo el cuidado de su cardiólogo de cabecera, estaba con poco o ningún síntoma, que se le dio de alta sin limitación de actividad y que continuó trabajando.[21] Además, señaló que el desfibrilador cardio vector tiene la función de evitar la muerte súbita por arritmia.[22] Contrario a lo expresado por el perito del Ministerio Público, el doctor relató que el testigo podría viajar a Puerto Rico a declarar presencialmente.[23] No obstante, indicó que, **si el señor Bonilla Torres fuera su paciente, dentro de las circunstancias, velaría porque se expusiera al menor riesgo posible**.[24] Aceptó también, que **de contraer COVID-19, el señor Bonilla Torres, por su condición cardiaca, se expondría a un riesgo mayor que cualquier otra persona saludable**.[25]

---

[19] Íd., págs. 145-146.
[20] Íd., págs. 201,206.
[21] Íd., pág. 199.
[22] Íd., págs. 201-202.
[23] Íd., pág. 198.
[24] Íd., págs. 219-220.
[25] Íd., págs. 221, 230.

Así las cosas, el 23 de diciembre de 2020, el Tribunal de Primera Instancia denegó la solicitud del Ministerio Público y ordenó que el testigo declarara presencialmente en corte abierta durante el juicio.[26] En su *Resolución*, el foro primario razonó que "los argumentos esbozados por el Ministerio Público no justifican alejarnos de la norma en cuanto al derecho a la confrontación y al careo durante el juicio".[27] Basó este raciocinio, en que el testigo tuvo la oportunidad de viajar a Puerto Rico en dos ocasiones anteriores —2018 y 2019— para declarar presencialmente sin restricción alguna y que utilizar el mecanismo de videoconferencia en este caso no adelantaba una política pública importante.[28]

Inconforme con esta determinación, el 21 de enero de 2021 el Estado, a través de la Oficina del Procurador General, presentó ante el Tribunal de Apelaciones una *Petición de Certiorari* en la que alegó que existía una "necesidad manifiesta" que le permitía al testigo declarar mediante videoconferencia, esto, con el propósito de garantizar su vida e integridad física. Oportunamente, el recurrido compareció el 12 de febrero de 2021 a través de una *Oposición a Solicitud de Certiorari* y arguyó que el Ministerio Público no demostró que existiese un interés sustancial que proteger ni que

---

[26] *Resolución*, Apéndice de la Petición de *certiorari*, pág. 34-41.
[27] Íd.
[28] Íd.

el uso de videoconferencia fuese el mecanismo necesario para cumplirlo. Así, concluyó que la determinación del foro primario fue correcta, pues, la presencia del testigo en sala garantizaba el derecho de confrontación.

Ulteriormente, el 19 de julio de 2021, el Tribunal de Apelaciones denegó la expedición del auto solicitado. Consideró que la condición cardiaca del testigo era preexistente y el hecho de viajar a Puerto Rico, como había hecho anteriormente no representaba ninguna contraindicación para su padecimiento de salud. Además, manifestó que "las actuales guías, vacunas y normas establecidas para atender la emergencia de salud pública […] [garantizaban] al señor Bonilla Torres un margen de protección suficiente".[29]

El 3 de agosto de 2021, el Procurador General solicitó reconsideración ante ese foro y reiteró que la condición delicada de salud del testigo en conjunto con los riesgos que supone el COVID-19, hacían pertinente y necesario que el testimonio del señor Bonilla Torres se realizara a través de videoconferencia. No obstante, el 19 de agosto de 2021 el foro intermedio emitió una *Resolución* en la que mantuvo su determinación previa.[30]

No conteste con la decisión, el 15 de septiembre de 2021, el Procurador General acudió ante este Tribunal

---

[29] *Resolución del Tribunal de Apelaciones*, Apéndice de la Petición de *certiorari*, págs. 288-298.
[30] *Resolución*, Apéndice de la Petición de *certiorari*, pág. 313.

mediante *Petición de Certiorari* y le imputó al tribunal apelativo el error siguiente:

> **El Tribunal de Apelaciones erró al avalar que el testigo de cargo que padece fallo cardiaco severo viaje a Puerto Rico a declarar presencialmente, en lugar de mediante un sistema de videoconferencia de dos vías, que garantizaría el derecho a confrontación del acusado y la salud y vida del testigo.**

Como parte del trámite ordinario, y luego de que se discutiera el asunto en la Sala de Despacho I, el caso se incluyó como parte de los recursos a ser discutidos en la reunión del Pleno celebrada el 10 de diciembre de 2021. Ese día, una mayoría de este Tribunal decidió no expedir el auto solicitado. No obstante, el Juez Asociado señor Feliberti Cintrón y la Jueza Asociada señora Pabón Charneco se unieron a lo expresado por este servidor con relación a la recomendación de expedir el recurso de *certiorari* presentado por el Procurador General.

De esta manera, luego de estudiar con detenimiento el recurso de epígrafe, así como los múltiples anejos que le acompañan, me veo precisado a pronunciarme sobre las razones por las cuales disiento del curso decisorio tomado por la mayoría de este Tribunal al denegar la expedición del recurso.

## II

### A. Derecho a la confrontación

La Sexta Enmienda de la Constitución de Estados Unidos reconoce el Derecho que tienen todos los acusados de delito a confrontar los testigos que se presenten en su contra en cualquier proceso criminal.[31] Este derecho fundamental aplica a los gobiernos estatales al amparo de la Cláusula del Debido Proceso de Ley de la Decimocuarta Enmienda de la Constitución federal.[32]

De igual forma, la Constitución de Puerto Rico consagra similar Derecho al establecer que en los procedimientos criminales, los acusados tendrán derecho a "carearse con los testigos de cargo".[33]

Estas disposiciones, conocidas como Cláusulas de Confrontación, recogen el principio fundamental de colocar al acusado en una posición adecuada para enfrentar a sus acusadores.[34] Este principio está vinculado con el debido proceso de ley dado que los acusados deben tener la oportunidad para defenderse de las acusaciones del Estado.[35]

Reiteradamente, hemos señalado que, tanto al amparo de la Constitución federal como la estatal, el derecho a

---

[31] "In all criminal prosecutions, the accused shall enjoy the righ […] to be confronted with the witnesses against him". Enmda. VI, Const. EE. UU., LPRA, Tomo 1.

[32] *Pointer v. Texas*, 380 US 400 (1965).

[33] Art. II, Sec. 11, Const. de PR, LPRA, Tomo 1, ed. 2008, pág. 343.

[34] *Pointer v. Texas*, supra, pág. 405.

[35] Íd.

la confrontación opera en la etapa de juicio y su objetivo principal es evitar la celebración de los juicios mediante declaraciones *ex parte* y deposiciones que priven al acusado la oportunidad de examinar y contrainterrogar personalmente a los testigos.[36]

Así, hemos reconocido que el Derecho a la Confrontación, fundamentalmente, tiene tres (3) vertientes procesales, a saber: (1) derecho al careo o confrontación cara a cara con los testigos adversos; (2) derecho a contrainterrogar, y (3) derecho a que se excluya la prueba de referencia que intente presentar el Ministerio Público.[37]

En lo pertinente al caso de autos, la primera vertiente exige que los testigos declaren frente al acusado. El derecho al careo "es la confrontación con los testigos de cargo en presencia del tribunal".[38] Por tal motivo, las controversias relacionadas a esta vertiente se refieren a situaciones limitantes a la interacción "cara a cara" entre el testigo que declara en el Juicio, y el acusado.

---

[36] *Pueblo v. Cruz Rosario*, 204 DPR 1040, 1048 (2020); *Pueblo v. Rodríguez Aponte*, 116 DPR 653, 660 (1985). Véanse, además, *Barber v. Page*, 390 US 719, 725 (1968); *Mattox v. United States*, 156 US 237, 242 (1895).

[37] *Pueblo v. Pérez Santos*, 195 DPR 262, 269-270 (2016); *Pueblo v. Guerrido López,* 179 DPR *950, 957* (2010).

[38] *Pueblo v. Cruz Rosario,* 204 DPR 1040 (2020), citando a D. Nevares Muñiz, *Sumario de Derecho Procesal Penal Puertorriqueño*, 10ma ed. rev., Puerto Rico, Ed. Instituto para el Desarrollo del Derecho, 2014, pág. 243.

Sobre este particular, en Coy v. Iowa, 487 US 1012 (1988),[39] el Tribunal Supremo de Estados Unidos resolvió que interponer una pantalla entre un acusado y unos declarantes ⸺menores de edad⸺, violaba el derecho a confrontación garantizado en la Sexta Enmienda de la Constitución federal. Al así resolver, el Máximo Foro federal expresó que dejaba para otra ocasión el examen de si existían o no excepciones al derecho de confrontarse cara a cara con los testigos que declaran en un Juicio. De hecho, el Tribunal enfatizó que fueran cuales fuesen las excepciones a este derecho, estas se permitirían solo en circunstancias necesarias para **promover una política pública importante.**[40]

Eventualmente, en Maryland v. Craig, 497 US 836 (1990), la Corte Suprema respondió la interrogante que se había reservado en Coy v. Iowa, *supra*, y, en efecto, determinó tajantemente que la cláusula de confrontación **no le garantiza a los acusados un derecho absoluto de**

---

[39] En este caso se le imputó a un acusado haber agredido sexualmente a dos niñas. Un estatuto de Iowa permitía que, en casos de delitos sexuales, los testimonios de denunciantes menores de edad se ofrecieran a través de un circuito cerrado de televisión o detrás de una pantalla o "*screen*". A petición del Ministerio Público, el tribunal de instancia aprobó el uso de una pantalla grande que fue colocada entre el acusado y el podio de testigos mientras las niñas testificaban. El Tribunal rechazó el argumento de que se violó su derecho de confrontar a las testigos, dado que la capacidad de interrogarlas no fue afectada por la pantalla. Posteriormente, el Tribunal Supremo Federal revocó la condena del acusado tras concluir que el uso de la pantalla violó la Cláusula de Confrontación.

[40] *Coy v. Iowa*, 487 US 1012, 1021 (1988). "We leave for another day, however, the question whether any exceptions exist. Whatever they may be, they would surely be allowed **only when necessary to further an important public policy**". (Énfasis suplido).

**estar cara a cara con los testigos que declaren en su contra en un juicio.**[41]

Señaló, además, que el objetivo principal de este derecho es garantizar la confiabilidad de la evidencia presentada contra un acusado sometiéndola a pruebas rigurosas en el contexto de un proceso adversativo ante el juzgador. De igual forma, concluyó que aunque la Cláusula de Confrontación refleja una preferencia por la confrontación cara a cara en el Juicio, tal preferencia **debe ceder ante consideraciones de política pública examinadas en conjunto con las necesidades y particularidades de cada caso.**[42] Por lo tanto, aunque reafirmó la importancia de la confrontación presencial con los testigos de cargo, **resolvió que la presencia física no debe valorarse como un elemento indispensable.**[43] Finalmente, reconoció el estándar que debe ser aplicado cuando el Tribunal tenga ante sí una petición para limitar el derecho al careo ——de manera presencial——. Conforme con ello, el Máximo Foro federal estableció que para poder limitar el derecho de confrontación de manera

---

[41] *Maryland v. Craig*, 497 US 836, 837 (1990). "The Confrontation Clause **does not guarantee criminal defendants an absolute right to a face-to-face meeting with the witnesses** against them at trial. The Clause's central purpose, to ensure the reliability of the evidence against a defendant by subjecting it to rigorous testing in an adversary proceeding before the trier of fact, is served by the combined effects of the elements of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier of fact".(Énfasis suplido).

[42] *Maryland v. Craig*, supra, pág. 849. "In sum, our precedents establish that 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial', a preference that must occasionally give way to considerations of public policy and the necessities of the case". (Cita omitida).

[43] Íd., págs. 849-850.

presencial, el análisis jurídico deberá estar guiado por dos criterios, entiéndase: (1) que se adelante una política pública importante y (2) que se asegure la confiabilidad del testimonio.[44] Cabe destacar, que en ocasiones, esta confiabilidad se puede alcanzar en procesos que no presenten confrontación cara a cara cuando se utilice un procedimiento que garantice un riguroso examen adversarial que preserve la esencia de una confrontación efectiva.[45]

En ese sentido, no se debe perder de perspectiva que lo medular, en relación con el derecho a la confrontación, "es que la defensa tenga la oportunidad de contrainterrogar".[46] Aunque el contrainterrogatorio de los testigos en el juicio no es sinónimo del derecho a la confrontación, lo cierto es que "el central o núcleo del derecho, es el derecho del acusado a contrainterrogar a los testigos en su contra".[47]

Por otro lado, y en el contexto de la emergencia salubrista que comenzó en el año 2020 y que aún nos continúa afectando, este Tribunal atendió un asunto referente al derecho a la confrontación, en su vertiente específica sobre el careo en *Pueblo v. Cruz Rosario,* 204

---

[44] Íd., pág. 850. "[A] defendant's right to confront accusatory witnesses **may be satisfied absent a physical, face-to-face confrontation** at trial only **where denial of such confrontation is necessary to further an important public policy** and only **where the reliability of the testimony is otherwise assured**".

[45] Íd., pág. 857.

[46] *Pueblo v. Stevenson Colón*, 113 DPR 634, 639-640 (1982).

[47] E.L. Chiesa Aponte, *Derecho Procesal Penal*, 81 Rev. Jur UPR 373, 381 (2012).

DPR 1040 (2020). Allí resolvimos que declarar con una mascarilla quirúrgica o de tela que cubra la boca y la parte inferior de la nariz no incide sobre la confiabilidad del testimonio ofrecido por un testigo si se cumple con los demás elementos del derecho al careo. De igual forma, adoptamos la postura de la Máxima Corte federal en <u>Maryland v. Craig</u>, *supra*, y reiteramos que la "Cláusula de Confrontación puede satisfacerse sin **la presencia física del testigo en el Juicio**, siempre que al acusado se le hubiera provisto la oportunidad de contrainterrogarlo previamente".[48] En sintonía con la jurisprudencia federal, reconocimos que previo a limitar el derecho a carearse con los testigos de cargo, se debe realizar un examen basado en el estándar siguiente: (1) que se adelante una política pública importante, y (2) que se asegure la confiabilidad del testimonio. Una vez superado este escrutinio se puede limitar el derecho en cuestión válidamente.

Ahora bien, con el fin de expandir el análisis previo, establecimos que una vez queda establecida la política pública que justifica la limitación, se tomaran en cuenta los elementos siguientes para asegurar la confiabilidad del testimonio ofrecido en el Juicio: (1) la presencia física; (2) el testimonio bajo juramento; (3) la oportunidad de contrainterrogar, y (4) la

---

[48] *Pueblo v. Cruz Rosario,* 204 DPR 1040, 1055 (2020).

oportunidad de evaluar el comportamiento del testigo.[49] De hecho, el único elemento que resulta imprescindible es la oportunidad de conducir un contrainterrogatorio efectivo. **Los demás, serán evaluados caso a caso** en vías de determinar el menoscabo que pudiese experimentar el Derecho a la Confrontación para determinar si el **efecto combinado** de estos constituye suficiente salvaguarda para asegurar la confiabilidad del testimonio. De esta manera, si se garantiza esta confiabilidad, se satisface la exigencia de la Cláusula de Confrontación.[50]

Como complemento a lo anterior, estimamos necesario resaltar lo resuelto por este Tribunal en Pueblo v. Santiago Cruz, 205 DPR 7 (2020). En esa ocasión, por voz de la Jueza Presidenta Oronoz Rodríguez, resolvimos que no existía impedimento constitucional alguno, ni al amparo de nuestra Constitución ni de la Constitución federal, para celebrar procedimientos penales preliminares al juicio a través del mecanismo de videoconferencia. Ello, en virtud de que, a través de este método, se garantizaba la oportunidad de que el juzgador pudiera evaluar el comportamiento de quien declarara de esta forma. Además, resaltamos que la videoconferencia es un método que sustituye la comparecencia personal del participante por una comparecencia a distancia, bidireccional y simultánea

---

[49] Íd., pág. 1057.
[50] Íd.

que, por su naturaleza, permite que una persona participe de un proceso judicial de manera remota. Lo anterior, en el contexto de eliminar el riesgo de contagio para el personal que de otra manera se encontraría en la sala del tribunal.[51]

De hecho, por lo pertinente al asunto que atendemos, reseñamos las referencias hechas por este Tribunal en Pueblo v. Santiago Cruz, *supra*, sobre cómo distintos tribunales federales han aplicado el uso de videoconferencia de doble vía para permitir testimonios fuera de sala. En ese particular, este Tribunal mencionó que

> varios tribunales no han vacilado en aplicar el uso de la videoconferencia de doble vía ante otros intereses de política pública importantes o apremiantes. Véase, por ejemplo, *Lipsitz v. State*, 442 P.3d 138, 144 (Nev. 2019) (donde un testigo era una víctima que residía en una facilidad de rehabilitación por abuso de sustancias controladas que **se encontraba fuera del estado**); *State v. Seelig*, 738 S.E.2d 427, 434-435 (N.C. App. 2013) (donde un experto que **vivía en otro estado** acreditó sufrir de un desorden psicológico severo que le impedía abordar un avión); *People v. Wrotten*, 923 N.E.2d 1099, 1100-1103 (N.Y. App. 2009) (donde se permitió interrogar a un testigo de 85 años **con una enfermedad cardiaca severa**); *Bush v. State*, 193 P.3d 203, 214-216 (Wyo. 2008) (donde se permitió el interrogatorio por videoconferencia **a un testigo con problemas cardiacos severos**, luego de sufrir un fallo renal). (Énfasis suplido)

---

[51] *Pueblo v. Santiago Cruz*, 205 DPR 7, 34 (2020).

En concordancia, un Tribunal de Distrito federal del Distrito Sur de Nueva York expresó que, dependiendo de las circunstancias de los testigos del Ministerio Público, el testimonio remoto podrá cumplir con los principios elementales de la Sexta Enmienda de la Constitución federal. De igual forma, se detalló que al menos, en ciertas instancias, los testimonios a distancia podrán ser necesarios con la intención de promover el fuerte interés público de evitar la exposición de individuos al COVID-19 cuya salud está comprometida y están catalogados como personas de alto riesgo.[52]

## B. Función de los foros revisores

Reiteradamente hemos intimado, como principio fundamental para el funcionamiento del sistema judicial, la deferencia que deben tener los foros revisores hacia la función adjudicativa que hace el juzgador de los hechos en el foro primario. En ese sentido, y como regla

---

[52] *United States v. Donzinger*, 2020 WL 4747532, pág. 3 (S.D.N.Y. 2020).

> [T]he court notes that depending on the circumstances of the Government's witness, remote testimony may comport with the Sixth Amendment principles set forth in *Craig* and *Gigante.* At least in some instances, allowing remote testimony may be needed to promote the strong public interest in avoiding exposing at-risk individuals to COVID-19 and minimizing further spread of the virus. See *Craig*, 497 U.S. at 850 (finding that the public policy of "protecting child witnesses from the trauma of testifying in a child abuse case" justified an exception to the ordinary "face-to-face confrontation" requirement). And depending on the witness's situation, the health risks and travel restrictions occasioned by the ongoing pandemic may also constitute "exceptional circumstances" that would permit the use of video testimony. See Gigante, 166 F.3d at 81-82 (2d Cir. 1999) (finding that witness's illness and participation in a witness protection program were "exceptional circumstances" such that the witness could testify by closed-circuit television).

general, no debemos intervenir con las determinaciones que este haya efectuado en virtud de la presunción de corrección de la que gozan.

Ahora bien, esta normativa no es absoluta ni opera de manera omnímoda. Podemos preterir esta deferencia cuando el juzgador de hechos haya incurrido en pasión, prejuicio, parcialidad, error manifiesto, o cuando un análisis integral de la prueba así lo justifique.[53] Ciertamente, hemos reiterado tal normativa conscientes de que el juzgador primario puede equivocarse en la apreciación de la prueba que realiza. Bajo esa estampa, hemos establecido que los foros apelativos podrán intervenir con tal apreciación **luego de realizar una evaluación rigurosa y que, de esta, surjan serias dudas, razonables y fundadas.**[54]

Así, pues, "una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal".[55] Por eso, aunque exista prueba que sostenga alguna determinación del tribunal, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto **con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida**, las

---

[53] *Pueblo v. Casillas, Díaz*, 190 DPR 398 (2014); Pueblo v. Calderón Álvarez, 140 DPR 627, 644 (1996).
[54] Íd.
[55] *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 772 (2013) citando a *Méndez v. Morales*, 142 DPR 26 (1996).

consideraremos claramente erróneas". E. Rivera García, <u>Compendio sobre el sistema acusatorio: Experiencias compartidas</u>, capítulo <u>Los criterios de revisión judicial y su aplicación en el sistema acusatorio</u>, San Juan, Publicaciones Gaviotas, 2019, pág. 325.[56]

Ante la ausencia de un mecanismo infalible para encontrar la verdad, la determinación de lo que es o no cierto es un deber de conciencia, deber que no está reservado solo al juzgador de los hechos, sino que compete también a los tribunales apelativos.[57]

## III

El Procurador General recurre ante nos para que revoquemos una determinación del Tribunal de Apelaciones en la que no se le permitió al Ministerio Público presentar el testimonio de un testigo de cargo por medio del mecanismo de videoconferencia porque la condición cardiaca de este y los riesgos que representaba para su salud una infección con el COVID-19, no constituía una justificación válida para permitir su testimonio de manera virtual. Sin embargo, una mayoría de este Tribunal decidió no acoger el recurso.

De entrada, tanto las determinaciones de los foros revisados, así como la negación de una mayoría de este Tribunal para atender el recurso de epígrafe, son erradas

---

[56] Citando a *Dávila Nieves v. Meléndez Marín*, supra.

[57] E. Rivera García, *Compendio sobre el sistema acusatorio: Experiencias compartidas*, capítulo *Los criterios de revisión judicial y su aplicación en el sistema acusatorio*, San Juan, Publicaciones Gaviotas, 2019, pág. 329.

por constituir un desacertado ejercicio de discreción que contraviene, en su sentido más literal, el criterio de razonabilidad dentro de las circunstancias particulares del caso. Por ello, **disiento enérgicamente**. Me explico.

Es norma conocida, aunque algunos lo quieran ignorar, que el derecho al careo, es decir, a la confrontación cara a cara entre el acusado y los testigos adversos, **no es un derecho absoluto, y puede ceder ante un interés apremiante de política pública siempre que se asegure la confiabilidad del testimonio**. Lógicamente, se debe examinar, en conjunto, las necesidades y particularidades de cada caso previo a determinar que un testigo necesita una protección especial porque su salud, vida o seguridad se encuentra bajo riesgo.

En este caso, **es un hecho incontrovertido que la salud del señor Bonilla Torres está en inminente y constante riesgo debido a la severa condición cardiaca** que padece. El facultativo médico del Ministerio Público que declaró en calidad de perito, indicó que, tras su evaluación, diagnosticó al testigo con **fallo cardiaco severo**, esto debido a que su corazón estaba **más grande de lo normal y funcionaba con apenas un treinta por ciento (30%) de fuerza**. Además, expresó que exponer al testigo a situaciones de alto estrés, podría generarle una **muerte súbita**.

A este complicado cuadro médico, debemos añadirle que, al presente, aproximadamente a dos años de decretada

la emergencia salubrista mundial, aún continuamos batallando con los estragos y retos que trajo consigo el COVID-19, virus que continúa cobrando vidas y que, sin lugar a duda, pone en riesgo la salud de todos, pero en particular, la de aquellas personas que se encuentran en la categoría de alto riesgo y mayor propensión a sufrir efectos severos o complicaciones ——como en el presente caso——. Ante este panorama, y de acuerdo con lo expresado por los expertos doctores que testificaron en la *Vista de Necesidad*, quedó patentemente claro que **el señor Bonilla Torres era un paciente de alto riesgo frente al letal virus**. Es decir, la condición cardiovascular del testigo y la amenaza constante del COVID-19 representan para este un riesgo dual de muerte.

Ahora bien, en el contexto de la pandemia actual, este Tribunal reconoció que esta provocó la adopción, como política pública de incalculable interés e importancia social, la imposición de ciertas medidas salubristas dirigidas a promover la seguridad de todo el componente humano de la Isla, tanto en el sector público como el privado. De igual forma, este Tribunal como cuerpo colegiado implementó las medidas de prevención necesarias para batallar contra el Covid-19 y salvaguardar la salud de los empleados y las personas que visitan nuestras aulas. En lo pertinente, extendimos estas medidas de seguridad a los procedimientos

judiciales, incluidos aquellos de naturaleza penal.[58] Como mencionamos, en Pueblo v. Cruz Rosario, *supra*, resolvimos que el uso de una mascarilla protectora por parte de un testigo de cargo no infringe los parámetros constitucionales que impone el derecho a la confrontación ante la crisis pandémica. Esta controversia, nos brindó la oportunidad de expresarnos sobre las medidas cautelares de prevención que pueden establecer los tribunales, de manera que se logre un balance entre el interés del acusado de confrontar a los testigos de cargo y el interés general de proteger a los testigos y demás participantes de los procesos judiciales de un potencial contagio con el virus.

Así reconocido, **podemos concluir definitivamente, que el primer requisito para limitar el derecho al careo**, es decir, que se persiga una importante política pública, **se cumple cabalmente** en el presente caso. De esta forma, el análisis requerido nos obliga a determinar si el método a utilizar para limitar el derecho en controversia garantiza la confiabilidad del testimonio que se pretender brindar.

A esos efectos, reconocimos que la videoconferencia es un método que sustituye la comparecencia personal del participante por una comparecencia a distancia, en dos

---

[58] Véase, *Pueblo v. Cruz Rosario,* supra.

direcciones y de proyección simultánea.[59] Por su naturaleza, este método permite que una persona participe de un proceso judicial de manera remota y elimina el riesgo de contagio para las personas que pudieran estar presentes. De igual forma, garantiza la confiabilidad de todo el trámite, ya que los participantes pueden preguntar y recibir respuestas instantáneas. También, mediante este método se garantiza la oportunidad de que el juzgador de los hechos pueda evaluar el comportamiento o *demeanor* de quien declara en su plenitud. No debemos olvidar que **la presencia física no se valora como un elemento indispensable.**

Con lo anterior expuesto, puedo **responder en la afirmativa** al cuestionamiento de si el método solicitado para limitar el derecho en cuestión garantiza la confiabilidad testimonial.

De hecho, la contestación a esta interrogante también encuentra respaldo en lo establecido en <u>Pueblo v. Cruz Rosario</u>, *supra*, donde se emitieron múltiples expresiones a favor de la confiabilidad del mencionado método digital. Conviene resaltar algunas de las expresiones de los compañeros y compañeras de estrado para dejar de manifiesto la incongruencia de las posturas que hoy asumen. En primer lugar, llamamos la atención a

---

[59] *Pueblo v. Santiago Cruz*, 205 DPR 7, 34 (2020). Véase, además, *Guías Generales para el Uso del Sistema de Videoconferencia en los Tribunales del Estado Libre Asociado de Puerto Rico*, secc. III (A), pág. 4.

lo manifestado por la entonces Jueza Asociada señora Rodríguez Rodríguez, que aunque reconocemos que debido a su merecido retiro de esta Curia hoy no contamos con su postura en el presente caso, sí contamos con sus acertadas expresiones, aludiendo, en aquella ocasión, a que "[m]ientras dure esta situación excepcional —y en consideración al interés apremiante de proteger la salud y la vida de los ciudadanos— celebrar los juicios y otros procesos judiciales mediante videoconferencia, en aquellos casos que **sean más propicios para ello, debe ser una norma <u>imperativa</u> y no una optativa**". (Énfasis suplido).[60]

Por su parte, y en armonía con lo anterior, varios miembros de la mayoría que hoy deniega la revisión del auto de *certiorari*, en la referida Opinión expresaron que, en efecto, **el mecanismo de videoconferencia salvaguarda la confiabilidad del proceso y establece un balance adecuado entre los intereses que están en controversia.**

En ese sentido, y en el contexto de que los jueces y la representación legal de las partes puedan apreciar adecuadamente el comportamiento de los testigos, el Juez Asociado señor Colón Pérez indicó que se debe "considerar la alternativa de celebrar las vistas mediante el mecanismo de videoconferencia" y que la manera **más razonable para armonizar y balancear los intereses en**

---

[60] *Pueblo v. Cruz Rosario,* supra, pág. 1086.

**pugna "es mediante el uso obligatorio de los sistemas de videoconferencias** en el proceso judicial". (Énfasis suplido).[61]

Por su lado, en su disenso, el Juez Asociado señor Estrella Martínez reconoció la utilidad del mecanismo de videoconferencia, al señalar que **"medios menos onerosos —tales como el testimonio a través de videoconferencia— [permitirían] ejercer un mejor balance entre proteger la salud de todos los participantes del proceso y salvaguardar, dentro de lo posible, los tres corolarios del derecho a la confrontación".** (Énfasis suplido).[62] También, indicó que este mecanismo garantiza adecuadamente la confiabilidad del testimonio ya que, además de mantener la facultad de percibir "gestos faciales y expresiones vitales para la observación y la credibilidad de la persona testigo", el mecanismo de videoconferencia **ofrece múltiples indicadores de confiabilidad,** "como lo son el juramento de la persona testigo, la oportunidad de contrainterrogar y la capacidad del jurado de apreciar el testimonio".[63] Concluyó, que "el hecho de que la persona acusada no interese celebrar el juicio en su *totalidad* mediante videoconferencia no elimina automáticamente la

---

[61] *Pueblo v. Cruz Rosario*, supra, pág. 1137.
[62] Íd., pág. 1117.
[63] Íd., pág. 1119.

alternativa de que las personas testigos sí declaren mediante esta vía". (Énfasis suplido).[64]

Entretanto, la Jueza Presidenta Oronoz Rodríguez, expresó, que a través de una videoconferencia, aunque el testigo no se encontraría presente de manera física, sí lo estaría a través de una "tecnología **que faculta sus interacciones con el resto del componente** de la sala". De este modo, expresó que

> Para ello, los receptores estarían conectados a una plataforma en común que permite que todos puedan verse y escucharse en una comunicación de doble vía. Esto sucede de manera **muy similar a como sucedería si el testigo estuviera presencialmente allí**. Al amparo del estándar de *Maryland v. Craig*, supra, **el mecanismo de interrogatorio en el juicio, por medio de la videoconferencia de doble vía, también provee un método necesario y adecuado que adelanta el interés público importante de proteger vidas al prevenir la propagación del virus letal COVID-19**. En términos generales, por su naturaleza, la videoconferencia permite que una persona pueda participar de un proceso judicial de manera remota, eliminando por completo el riesgo de contagio entre esa persona y el receptor que se encuentre al otro lado de la conexión inalámbrica. (Énfasis suplido).[65]

Ahora bien, todas estas expresiones parecen indicar que, en su momento, y con visión prospectiva, una mayoría de este Tribunal entendía y **creía** fielmente que el uso de la tecnología era indispensable para evitar la paralización permanente de los procesos judiciales, proveerle un entorno saludable a los participantes —partes, testigos, jueces y demás funcionarios del

---

[64] Íd.
[65] Íd., pág. 1080.

tribunal— y brindarle continuidad al sistema en medio de una emergencia salubrista que trastocó la acostumbrada realidad de la sociedad mundial.

No obstante, con la errada decisión tomada por una mayoría, hoy se soslayan fundamentos jurídicos y constitucionales que, en ocasiones anteriores, este Tribunal puntualizó y caracterizó como de vanguardia desde el contexto de la pandemia del coronavirus.

Además, es necesario precisar, que con esta determinación se lesiona directamente la declaración de política pública e institucional del Poder Judicial establecida en el *Plan Estratégico del Poder Judicial de Puerto Rico, 2020-2025: Mapa hacia una justicia de vanguardia*, específicamente en el tema sobre *Tecnología para la Justicia*. A fin con mi postura, debo indicar que el objetivo principal de esta sección consiste en "concebir la tecnología como una herramienta facilitadora para lograr el acceso a la justicia, al facilitar el acceso a los tribunales y servicios y agilizar los procesos para la vindicación adecuada de los derechos de las personas".[66] Sin embargo, la determinación denegatoria con la que aquí discrepamos parece ignorar estos postulados y despacha el asunto con desapego, avalando un claro abuso de discreción de los foros recurridos.

---

[66] *Plan Estratégico del Poder Judicial de Puerto Rico, 2020-2025: Mapa hacia una justicia de vanguardia*, pág 10.

En vista de lo anterior, nos preguntamos: ¿Cuál es la necesidad de exponer a un potencial peligro de muerte súbita a un testigo con cardiomiopatía severa al obligarlo a testificar presencialmente, a pesar de que contamos con el mecanismo de videoconferencia de doble vía, que, por su naturaleza, garantiza el derecho de confrontación de los acusados? Claramente no encuentro una respuesta sensata y lógica a tal cuestionamiento.

Ciertamente, obligar a un testigo de cargo que padece de una severa condición cardiovascular a viajar a Puerto Rico para declarar presencialmente en un juicio en su fondo, en lugar de permitir su testimonio mediante el sistema de videoconferencia de doble vía comprende un error sustancial, especialmente, cuando hemos reconocido una alternativa viable y segura para atender ese escenario. Lo anterior, cobra mayor relevancia cuando consideramos la posibilidad real de que el señor Bonilla Torres pueda contagiarse con el COVID-19 ——siendo un paciente de alto riesgo——, por lo que indudablemente, es una **situación excepcional** que amerita una consideración adicional y razonable. No podemos perder de perspectiva que, tal como declararon los médicos en la vista de necesidad, el simple hecho de que el testigo se enfrente a una situación de alto estrés, podría provocar su muerte súbita. Me parece que tales declaraciones bajo ningún contexto o justificación deben considerarse livianamente, pues lo que está en riesgo es la vida misma del testigo.

Examinado desde la noción más elemental posible, el hecho de que un paciente cardiaco viaje mientras aún existen constantes brotes de COVID-19, para que este pueda testificar en un procedimiento criminal en su fondo, resulta, obviamente, en un estresor de alto nivel que podría provocar la muerte instantánea del testigo. La anterior aseveración no es una simple alegación, sino que es el testimonio pericial de los médicos que declararon en la vista de necesidad. Insisto, el problema en el presente caso no es meramente viajar, sino viajar con el peligro de contraer COVID-19.[67]

---

[67] Cabe destacar, que ante el despunte de contagios con la más reciente variante del COVID-19, denominada *Omicron*, es una realidad que la tasa de contagios y la tasa de muertes como causa directa de este virus ha aumentado drásticamente. De hecho, en tan solo doce días que han transcurrido de este nuevo año, se han reportado **ciento veintidós (122) muertes** a raíz de esta nueva variante. De estas defunciones, **veintiocho (28) se reportaron dentro de las últimas veinticuatro horas de emitir este voto particular.** (Portal estadístico del Departamento de Salud de Puerto Rico, https://www.salud.gov.pr/estadisticas_v2). Además, constaté que, dentro de este total de muertes, están personas que ya contaban con las vacunas requeridas contra el virus, por lo que argüir que la vacunación es un elemento que protege adecuadamente a la sociedad representa un discurso insuficiente y generalizado, particularmente en los casos cuando las personas ——como lo es el testigo de este caso—— presentan un cuadro de salud con un potencial riesgo de muerte, independientemente de su exposición al virus.

Además, para establecer desde una justa perspectiva la delicada situación que enfrentamos con este mortal virus, la totalidad de casos positivos a COVID-19 en Puerto Rico, **desde el 11 de diciembre de 2021 hasta el 12 de enero de 2022,** sobrepasa los **172,000 casos**. Esto incluye casos confirmados y casos probables. La cifra de muertes en ese mismo período refleja unas **ciento cuarenta y cuatro (144) defunciones.** (Portal estadístico del Departamento de Salud de Puerto Ric). Todo lo anterior atribuido a la nueva variante, que, sin dudas, representaría un riesgo mayor a la salud del testigo que de por sí, ya cuenta con una condición delicada.

Al igual que en Puerto Rico, en Estados Unidos la variante *Omicron* ha repuntado la proporción de casos positivos y las estadísticas muestran que los contagios están en constante aumento. (https://covid.cdc.gov/coviddatatracker). Tan reciente como el 3 de enero de 2022, Estados Unidos reportó sobre **900,000 nuevos casos de contagio**. Además, como muestra de lo letal que está siendo este nuevo repunte, Estados Unidos reportó **10,869 muertes en los pasados**

Por otra parte, nos llama la atención la expresión de la Jueza Presidenta Oronoz Rodríguez a los efectos de señalar que "[l]os protocolos del Poder Judicial, las guías de los organismos estatales, la vacunación y las normas actuales esbozadas para atender la emergencia salubrista, apuntan a que una persona prudente y razonable puede protegerse adecuadamente". Esta expresión obvia e ignora los múltiples casos de contagios, no solo dentro del Poder Judicial, sino en todas las esferas de nuestra sociedad, en donde personas, aun siendo prudentes y razonables con sus acciones, terminan contagiándose con el virus por la facilidad de propago que presenta la nueva variante *Omicron*. De hecho, **personas vacunadas que presentaban condiciones preexistentes han muerto** luego de contraer esta variante. Ese, precisamente, es una de las particularidades que presenta este caso y que teníamos la oportunidad de atender.

Igual de sorprendente es el argumento de que "no debemos intervenir con los foros inferiores, sobre todo, cuando el Ministerio Público no derrotó la presunción "de corrección y legalidad en el dictamen" y que el foro

---

**7 días.** (https://covid.cdc.gov/covid-data-tracker/ deathsinlast7days). Asimismo, la Organización Mundial de la Salud (OMS) ha recomendado, como acción prioritaria ante los desafiantes brotes causados por la variante *Omicron*, practicar el distanciamiento social y evitar la aglomeración de personas en lugares cerrados. Claramente, tales recomendaciones están fundadas en la anticipación y la previsión de un aumento en los casos de contagios y los problemas que pueden enfrentar las naciones ante esta nueva variante. *Enhancing readiness for Omicron (B.1.1.529): Technical brief and priority actions for Member States World Health Organization HQ*. Versión revisada el 23 diciembre de 2021. Por ello, no debemos despachar livianamente este asunto.

primario "no cometió un error manifiesto pues su apreciación no se distancia de la realidad fáctica ni tampoco es inherentemente imposible o increíble". Lo cierto es que dicha presunción no es absoluta y cede si de un análisis integrado de la evidencia recibida, basado en un marco de racionabilidad y justicia jurídica, quedamos convencidos de que se cometió un error. No hay duda que, tanto el testimonio del perito del Ministerio Público como el de la defensa ⸺aun cuando fue esquivo y acomodaticio⸺ reflejaron llanamente que el testigo padecía de una condición delicada y que exponerlo caprichosamente al contagio con el COVID-19 representa un riesgo de muerte. Es decir, lo más prudente bajo las circunstancias particulares de este caso, era permitir el testimonio a distancia del señor Bonilla Torres.

En comunión con todo lo anterior, y ante la preocupación que en algunos pueda generar nuestra postura de cara al futuro, quiero remarcar que la misma no está razonada en un vacío y se cimienta en pronunciamientos validados tanto por la Corte Suprema federal como por este Tribunal.

Y es que la limitación al derecho a la confrontación **nunca se hará sin antes celebrar una vista de necesidad** en la que el tribunal haga determinaciones específicas, caso a caso, y basadas en el escrutinio antes mencionado, sobre la necesidad apremiante de apartarse del modo

ordinario y preferido de testificar frente al acusado.[68] El filtro que supone la vista de necesidad tiene por objetivo proteger los derechos constitucionales de la persona acusada de manera que obliga al Estado a desfilar prueba sustancial que demuestre que, en efecto, se justifica la limitación del derecho al careo. Afín con este propósito, se reconoce la facultad que tiene el tribunal de examinar si el bienestar de la persona testigo requiere que testifique fuera de la presencia del acusado.

Una vez las partes presentan sus respectivos fundamentos y muestren evidencia que sustente sus posturas, entonces, **la vista ha cumplido su propósito**. Así, quedará en manos del tribunal realizar una determinación al respecto sopesando el escrutinio multifactorial esbozado en Pueblo v. Cruz Rosario, supra.[69]

Con este procedimiento, se dispersa cualquier duda que haya en cuanto a la errada percepción de que permitir un testimonio de manera virtual comprende una carta en blanco para esquivar de alguna forma el requisito constitucional de presencia física en la confrontación.

---

[68] Véase, E.L. Chiesa Aponte, *Procedimiento criminal y constitucional: Etapa adjudicativa*, San Juan, Eds. Situm, 2018, págs. 85-86, explicando el razonamiento de la determinación de *Maryland v. Craig*, supra.

[69] Criterios a evaluar: (1) interés apremiante del Estado; (2) testimonio goza de otros elementos que garanticen su confiabilidad, como lo sería (a) el juramento de la persona testigo, (b) la oportunidad de contrainterrogar, (c) la capacidad del jurado para apreciar el testimonio. *Pueblo v. Cruz Rosario,* supra, pág. 1055.

**Esto, pues, la médula del examen que viene obligado a realizar el tribunal no es de fácil alcance y supone un alto peldaño por superar.**

Hoy, se incurre en el **gravísimo error de sustituir el criterio médico** ——extensamente argumentado——, **por un razonamiento intransigente, caprichoso e irrazonable.** Esto, a pesar de que la evidencia científica presentada en sala fue contundente en exponer la fragilidad que exhibe la salud del señor Bonilla Torres. Máxime, cuando consideramos el testimonio del propio perito de la defensa cuando adujo que bajo el escenario en que el señor Bonilla Torres fuese su paciente, **velaría porque este se expusiera al menor riesgo posible.** Lo aquí expresado cobra mayor relevancia cuando analizamos la transcripción del testimonio de este doctor que refleja que este fue sumamente esquivo con sus contestaciones a preguntas dirigidas en esa dirección ——bienestar del testigo si fuera su paciente——, lo que denota un claro testimonio acomodaticio para la defensa. Este elemento fue totalmente ignorado por la mayoría de este Tribunal.

Ciertamente, es mi criterio que la determinación tomada por los foros inferiores, así como la que hoy alcanza una mayoría de este Tribunal, raya en la arbitrariedad y se aleja del rigor jurídico que merece una situación tan excepcional como la de autos. Especialmente, cuando existen precedentes judiciales en

el ámbito federal, y validados por nuestra jurisprudencia, que reconocen el uso de la videoconferencia como garante del derecho a la confrontación.

Una vez más, expreso mi **disenso enérgico** ante el proceder de una mayoría que denota carencia de sensibilidad y que, a su vez, abona a la pérdida de la confianza pública en nuestro sistema de justicia. **Lamentable por demás.**


                                    Edgardo Rivera García
                                       Juez Asociado